THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* EDWARD ALLEN, Plaintiff in Error.

*Opinion filed April 23, 1926.*

1. CRIMINAL LAW—*general rule as to when driver of automobile may be convicted of manslaughter.* In the case of an accidental death of a pedestrian struck by an automobile, where the proof is sufficient to establish, beyond a reasonable doubt, that under the circumstances of the injury the conduct of the driver of the machine was so reckless, wanton and willful as to show an utter disregard for the safety of pedestrians, a conviction for manslaughter will be warranted; but an injury caused by mere negligence, not amounting to a reckless, willful and wanton disregard of consequences, cannot be made the basis of a criminal action.

2. SAME—*what remark of prosecuting attorney is improper and prejudicial.* A remark of the prosecuting attorney, interrupting a witness for the defendant by saying, "You are telling a nice story," is highly improper and prejudicial to the defendant where the evidence is conflicting.

3. SAME—*what evidence is improper in prosecution of driver of automobile for manslaughter—argument.* In the prosecution of a driver of an automobile for manslaughter in killing a pedestrian,

evidence as to the extent of the injuries to another pedestrian who was also struck by the defendant's machine is improper where it has no tendency to prove any issue in the case, and it is improper for the prosecution to refer to such evidence in argument.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. HOSEA W. WELLS, Judge, presiding.

ROBERT E. CANTWELL, JR., (THOMAS E. SWANSON, of counsel,) for plaintiff in error.

EDWARD J. BRUNDAGE, ROBERT E. CROWE, State's Attorney, and VIRGIL L. BLANDING, (HENRY T. CHACE, JR., EDWARD E. WILSON, and CLYDE C. FISHER, of counsel,) for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

About nine o'clock in the evening, December 31, 1922, plaintiff in error, Edward Allen, while driving his taxicab west on Twenty-second street, at the intersection of that street and Western avenue, in Chicago, struck with his machine two young girls, Mary Rompala, aged thirteen years, and Helen Smalarz, aged fourteen years. Mary Rompala died as a result of the injuries she received. Allen was indicted in the criminal court of Cook county on the charge of manslaughter for the killing of Mary Rompala. The jury found him guilty as charged in the indictment, and the court sentenced him on the verdict of the jury to the penitentiary for an indeterminate term. Motions for new trial and in arrest of judgment were overruled. He has sued out this writ of error to review the record.

Twenty-second street runs east and west and is fifty-five feet wide. Western avenue runs north and south and intersects Twenty-second street, and is sixty-five feet wide. There are two street car tracks on each street. Twenty-second street is described as a pretty dark street west of Western avenue, with no arc lights. On each side of

Western avenue, going south from Twenty-second street, there are a lot of frame buildings, and the same is true after going a short distance north of Twenty-second street. On the northwest corner of the said intersection there is an ice cream parlor, facing south, and there is a restaurant north of the ice cream parlor and probably one or more factories. The northwest corner is fairly well lighted. There is a big factory on the southwest corner which is not doing business, and west of this factory are some railroad tracks. This corner is referred to as a rather dark corner. On the northeast corner of the intersection there is a big apartment building and a saloon north of that, and there is a light on the northeast corner. The only light on the southeast corner is from a restaurant on that corner. On the evening on which the deceased was killed she and Mary Smalarz, accompanied by the latter's mother, were returning from church and alighted from an east-bound street car on Twenty-second street, on the southwest corner of the intersection of said streets. After alighting they stepped to the sidewalk on the south side of Twenty-second street and waited for the street car, and about three automobiles following, to pass eastwardly. At that time a street car going south on Western avenue had stopped all east and west traffic. After a short wait the two little girls started to cross Twenty-second street to the north. They were holding each other's hands and running, and as they started running they passed between two of the automobiles that had been standing there and were traveling on a north and south line about twenty feet or more west of the west line of Western avenue. They ran right in front of the car of the plaintiff in error as they reached the north street car track and were struck by his car, which was traveling westward, with its wheels straddling the north rail of the north street car track. The other facts concerning the collision are in dispute and it will be necessary to review the evidence.

There were two eye-witnesses who testified for the People, and four, including the plaintiff in error, who testified for him. Mary Smalarz, aunt of the deceased, testified as follows: On the evening of the day that Mary Rompala was killed she and her daughter and the deceased had gone to church and at the time the deceased was struck by plaintiff in error's cab they were returning home. They had alighted from the street car at the southwest corner of the intersection of Western avenue and Twenty-second street and had stood on the sidewalk on the south side of Twenty-second street until the street car, and the automobiles following it, had passed east. At the same time a street car on Western avenue, going south, had stopped the east and west traffic on Twenty-second street. Immediately thereafter three automobiles had gone west on Twenty-second street, on the north side of the street car tracks. After these automobiles had passed, the two girls walking ahead of her started to cross the street, and just as they reached the north car track they were struck by plaintiff in error's taxicab. She saw the cab before it struck the girls but she was not close enough to them to take hold of them. Afterwards the same taxicab that struck them immediately took them to the hospital. She also stated that the automobile that struck the girls was going fast, and that just before the girls were struck they had stepped from behind an automobile that was following the street car going east and from which they had alighted.

Fred Ewart, a chauffeur of the Black and White taxicabs, testified as follows: At the time the taxicab of the plaintiff in error struck the girls he (witness) was standing on the northwest corner of said intersection. He saw the girls and a woman standing on the southwest corner of the intersection of the two streets, or directly south across the street from him. He also saw a taxicab coming from the east, going west on Twenty-second street. The girls started running across the street hand in hand, and as soon as they

got to the north street car track they were struck by the taxicab. He was at the time of the trial a cab driver and at the time of the collision a truck driver. He stated that he was familiar with the speed of motor vehicles, and that in his opinion the taxicab was traveling about thirty miles an hour when it struck the girls. The taxicab did not slow up when it crossed Western avenue and gave no signal or warning of its approach. After the automobile struck the girls it kept on going and stopped about one hundred and fifty feet west from the point of the collision. He "hollered" at the cab driver and asked him if he knew he knocked those kids down and if he knew where there was a hospital. He then told him to back up to the children. The cab driver sat on the seat while he picked the children up and put them in the cab. One of the girls was lying about forty feet west of Western avenue, up against the curb, and the other one about fifty feet from the northwest corner of Western avenue and Twenty-second street. He (the witness) put the girls in the rear seat. Mrs. Smalarz also got into the car. The defendant did not help him put the children into the cab but some stranger that he did not know did help him, and he has not seen that man since. He assisted a police officer in testing the brakes of the cab of the defendant after the collision and found them to be good. From his experience it was his opinion that the cab, if traveling at the rate of thirty miles an hour, could be stopped within one hundred feet. He further stated that he did not see three automobiles going west ahead of plaintiff in error just before the collision, and if they had gone west he would have seen them; that he did not see the defendant's taxicab slow up as it went over Western avenue and did not hear the brakes applied as it approached the intersection of Western avenue and Twenty-second street. He rode with the defendant to the hospital but did not see him after the children were taken into the

hospital. The witness took Mrs. Smalarz back in the same cab, and he then went to the Marquette police station and reported to the police what he had seen. The cab that the defendant was driving was a DeLuxe cab.

Albert Tetic, a police officer, testified for the People that he was at the police station when the plaintiff in error surrendered himself and asked him to make a statement, which he (the witness) "wrote down just about as it was given to him" by plaintiff in error. He asked plaintiff in error about the rate of speed he was traveling, and he replied that he was going about twenty-five miles an hour as he approached Western avenue and there slackened his speed to about eighteen miles an hour and was traveling at that speed when the collision occurred. It appears from this witness' testimony that the plaintiff in error did not sign the statement that the officer had and which he stated that he had written just about as the plaintiff in error had directed. Plaintiff in error also testified in rebuttal that the statement that this officer had was not written correctly and was not written in accordance with his statements.

Franceline Stokes, head supervisor of employees at the Fair, a witness for plaintiff in error, testified in substance as follows: She was not acquainted with any of the parties connected with the accident. She was standing on the northwest corner of the intersection of Twenty-second street and Western avenue before and at the time of the collision. She hailed a cab standing on the east side of Western avenue, but the cab driver, who was the defendant, shook his head, indicating "no," as he had a passenger. A street car was going south on Western avenue, and the defendant's cab had stopped on the east side of that street to permit the street car to go south and then started west on Twenty-second street. She heard the defendant shift the gears of his machine and blow his horn as the car went south and saw the two girls running across the street and directly in front of the cab. The defendant's cab was not

going more than eight miles an hour when it struck the girls and stopped within four feet, and the defendant, assisted by another man who did not testify, put the girls in his cab. She observed other cars going west on Twenty-second street before the car that struck the girls, but she did not count them. Just after the girls were struck and fell on the street she saw the aunt of the deceased shake her finger at the girls and say something to them in a foreign language. The witness herself had driven automobiles and was familiar with the different gears on them and drives a Hudson car and has had three or four cars. From her experience in driving an automobile she was able to tell about how fast one was going. She estimated the ages of the girls to be about twelve and fourteen years and heard them yell or scream just about the time they were hit. The defendant did not back up his car to the bodies after they were hit but jumped right out and helped to put them in his taxicab.

Sonia Coy, an actress living at the Wichmere Hotel, testified that on the evening of the collision, about eight o'clock, she had had her dinner and engaged the defendant to drive her to her place of entertainment, and directed him to drive very slow because she had had several accidents and was very nervous. The defendant drove her from Twenty-second street and Wabash avenue and was careful and had stopped at every crossing and shifted gears and had not driven faster than fifteen miles an hour. When they arrived at Western avenue and Twenty-second street the defendant made a complete stop and shifted gears, as there was a street car going south on Western avenue. After the street car had passed and plaintiff in error had started his cab she noticed the two girls running very fast across the street and in front of the taxicab and by which they were struck. The defendant applied his emergency brake and stopped the car almost instantly after the collision. The defendant was not at any time traveling thirty miles an hour or speeding. The two girls were a consider-

able distance west of the west line of Western avenue as they crossed the street and ran in front of the defendant's machine, and they came from between a street car on the south side of Twenty-second street and an automobile that was following the street car, hand in hand, and that there were two or three cars following the street car. After the girls were struck there was a pretty stout gentleman there, about thirty years old, that assisted in putting the girls into the defendant's car and then took her (the witness) away to her place.

John Zingeralli testified for the plaintiff in error to the following: He is a chauffeur and at the time of the collision of plaintiff in error's cab with the little girls he was standing on the northwest corner of Twenty-second street and Western avenue. He saw plaintiff in error's cab, a DeLuxe cab, coming from the east, and he thought it contained a party he was to meet. The cab slowed down at the crossing of Western avenue while a street car passed in front of it, going south on Western avenue. At the same time there was a street car on the southwest corner of the intersection, headed in an easterly direction, and a couple of machines behind it. He saw the two children crossing the street, coming between the two machines. The children were holding hands and were running and ran directly in front of the taxicab that he had been watching approach from the east. The driver of the cab stopped within four feet after he struck the children, and, assisted by another man there, who was not the witness Ewart, put the children in his cab. At the time they were struck the girls were about twenty or twenty-five feet from the cross-walk. He stated that the cab would have collided with a street car if it had not stopped at the crossing, and at the time it struck the two girls it was not going faster than eight or nine miles per hour. He also stated that the girls were not thrown, when struck, over three or four feet, and that he noticed other machines passing him while standing on that corner

and heard the defendant blow his horn on the other side of the street. He further stated that he was watching the traffic there in all directions, as he was looking for a party he expected to meet there.

Plaintiff in error testified for himself, as follows: He picked up a lady passenger at Wabash and Twenty-second streets on the evening of the accident and was driving her to Cicero avenue. She instructed him not to drive fast, as she had plenty of time to get to her destination. He slowed down at every crossing, and upon arriving at the crossing of Western avenue came to a complete stop and allowed a south-bound street car to pass him on Western avenue. Before he crossed Western avenue on that occasion he blew his horn about four times, as there were persons passing on the cross-walk on Twenty-second street. After he had crossed Western avenue the two children came dashing across Twenty-second street, hand in hand, from between the two machines that were following an east-bound street car and they ran right into "my machine." He stopped his cab within four or five feet after the collision, opened his cab door, and, after fixing a robe for them, with the assistance of a fat fellow he put them into his cab and offered to, and did, take them to St. Anthony's Hospital as quickly as he could. After taking them to the hospital he called up his company and notified them he had had an accident; that on being informed by one of the Sisters at the hospital that one of the children was about to die, he went home and informed his mother about the accident and then went to the Marquette police station and told them that he had had an accident, and they put him into a cell. He further stated that he was not driving over eight or nine miles an hour at the time he struck the girls with his machine; that he was not addicted to the use of intoxicating liquors, was perfectly and absolutely sober at the time of the collision, and was a licensed chauffeur and had driven for five or six years or longer, and the bodies

of the two girls were close together, near the hind wheels of his car, when he picked them up.

The first error assigned and argued by plaintiff in error is that the evidence in the record fails to prove, beyond a reasonable doubt, that he was guilty of criminal negligence, and that the preponderance of the evidence shows that the death of Mary Rompala was an accident which he was powerless to prevent. This court has, in reviewing judgments for manslaughter where death was caused by alleged reckless driving of automobiles, laid down the rule that where the proof is sufficient to establish, beyond a reasonable doubt, that under the circumstances of the injuries the conduct of the drivers of the machines was so reckless, wanton and willful as to show an utter disregard for the safety of pedestrians, convictions for manslaughter will be warranted. These cases also recognize the rule that an injury caused by mere negligence, not amounting to a reckless, willful and wanton disregard of consequences to others, cannot be made the basis of a criminal action. *People* v. *Anderson,* 310 Ill. 389; *People* v. *Schwartz,* 298 id. 218; *People* v. *Camberis,* 297 id. 455; *People* v. *Falkovitch,* 280 id. 321.

The evidence in this record, which has been set out in detail, does not satisfactorily show, beyond a reasonable doubt, that the conduct of plaintiff in error was so willful and wantonly reckless as to justify the verdict of guilty of manslaughter. When considered alone, the evidence of the People's witness Ewart would be amply sufficient to warrant the verdict and judgment in this case, but this witness is contradicted by every witness for the defendant, as well as by the testimony of Mrs. Smalarz, in some important details of the evidence, as above shown. Mrs. Smalarz merely stated that the car of the defendant was going fast, and the record does not even reveal the rate of speed that she considered as "fast." The evidence of the police officer, Tetic, was very damaging to the plaintiff in error if the

facts were as he stated them, but his own testimony leaves doubt upon our mind as to whether or not he stated the facts as the defendant stated them to him. He wrote out his statement for the plaintiff in error to sign, but he did not do it. The plaintiff in error's own testimony is corroborated by three apparently disinterested witnesses who had the very best of opportunities to see what occurred on that unfortunate occasion and they all corroborate the defendant's testimony.

The judgment should be reversed for the further reason assigned by defendant's counsel of the gross misconduct of the assistant State's attorney, Romano, in examining one of the witnesses for the defendant and in arguing the case to the jury. While Miss Coy was testifying she started to describe the stout, fat man that assisted the defendant in putting the children into his cab, in this language: "He was a gentleman I would say about thirty years old and very stout, and the reason I remember him—" The court at this point broke in with this statement, "We don't care about the reasons." Romano then volunteered this impudent and improper remark, "You are telling a nice story." The defendant's counsel objected to the remarks of the court and the State's attorney and saved exceptions, but there was no ruling of the court on those objections. We can see absolutely no good reason for the court's interrupting her with his remark, as we see nothing improper in the witness stating why she remembered him. It was absolutely improper and the height of impudence for the State's attorney to make his insinuating remarks aforesaid, and the court should have ruled on the objections.

The assistant State's attorney also made highly inflammatory and improper argument to the jury, denouncing the defendant as a murderer and an assassin, and told the jury, in substance, that the defendant was not only guilty of murdering Mary Rompala, but was also guilty of maiming the other girl, Helen Smalarz, for life, and that the latter was

simply enduring a living death, and argued to the jury that the conduct of the defendant showed that he was not concerned about the death of the one and the ruthless maiming of the other that he had so recklessly caused. The reference to the latter girl was particularly objectionable, because the court had allowed one of the witnesses for the State, a physician, to detail the injuries to Helen Smalarz, to the effect that she had received a fracture of the skull and suffered from concussion of the brain, and also received a fracture of the right collar bone and a fracture of the spine and many bruises. The court also allowed Mrs. Smalarz to testify as to the condition of her daughter, Helen, and the witness flatly stated that her back was broken and her arms were broken and that she was still under the doctor's care. The trial took place more than a year after the accident happened, and the testimony of the physician also showed in his final examination that the last time that he saw Helen Smalarz, February 11, 1923, less than two months after the accident, her condition was such that she was able to walk around, though slightly bent forward on account of the fracture of the spine. He was further allowed to state that the injury was a permanent disability. The court allowed all this testimony, as expressly stated by the judge, for the mere purpose of showing that Helen Smalarz was not able to attend the court as a witness, but as a matter of fact the testimony did not so show. We hold that it was error for the court to allow such detailed statements of the injuries and the condition of Helen Smalarz, as the defendant was only on trial for the killing of Mary Rompala.

For the reasons aforesaid the judgment of the court is reversed and the cause remanded.

*Reversed and remanded.*