905 P.2d 209

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Kenneth YARBOROUGH, Defendant–Appellant.**

**No. 15794.**

Court of Appeals of New Mexico.

Sept. 13, 1995.

Certiorari Granted Nov. 3, 1995.

Tom Udall, Attorney General, M. Anne Wood, Assistant Attorney General, Santa Fe, for Plaintiff–Appellee.

Sammy J. Quintana, Chief Public Defender, Susan Roth, Assistant Appellate Defender, Santa Fe, for Defendant–Appellant.

## OPINION

FLORES, Judge.

1. Defendant appeals his conviction for involuntary manslaughter by careless driving. We consolidate the issues raised by Defendant on appeal and address them as follows: (1) whether a showing of criminal negligence is required for a felony involuntary manslaughter conviction and (2) whether the specific homicide by vehicle statute preempts the prosecution of vehicular killings under the general involuntary manslaughter statute. We reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

2. While driving northbound on a southbound lane of Interstate 25, Angelita Castillo struck Gretchen Bright's vehicle head-on. Castillo's car ended up in the middle of the two traffic lanes, facing the wrong way, the front side turned slightly to the west. Immediately after the collision, Jill Cornell drove up to the scene and parked her car on, or partially on, the shoulder of the right traffic lane, near Castillo's vehicle. At about the same time, John Coriz also pulled up and parked his car on the side of the interstate. Coriz got out of his car and stood in the middle of the interstate talking to Castillo, advising her not to move her car. During this time, Bright was standing partially in the right lane talking to Cornell, who was still in the driver's side of her car.

3. Meanwhile, Brenda Kumagai was driving southbound on Interstate 25 with her three sons when she saw headlights in the distance. Kumagai slowly pulled over onto the right shoulder and stopped before reaching the accident scene. She then proceeded slowly toward the accident scene in the right lane and pulled up behind Cornell's car to see if anyone needed help. Kumagai's car was partially on the shoulder and partially sticking out into the right lane of the interstate. The rear-end of her car was in the road because there were cars around her, and she was not sure if she could fit completely onto the shoulder. She was about six to eight feet away from Castillo's car. Kumagai did not have her vehicle's hazard lights on and did not see any of the other cars' hazard lights on either. As she was moving out of the space behind Cornell's car, onto the right lane of the interstate, her car was hit from behind by Defendant.

4. Defendant, who was driving a van, and his girlfriend, Victoria Bertch, were traveling southbound on Interstate 25 when they came upon the accident scene. Bertch testified that while she was fiddling around with a tape player behind her seat, Defendant said something which caused her to turn around. He said, "I'll have to go through them." Bertch saw cars in the road and thought there was enough room to drive between them. She testified that she was not afraid and that driving through the accident scene seemed like the logical thing to do.

5. Defendant remembered that he turned on the dome light in the van and looked down at the tapes behind the passenger seat while Bertch was trying to play some music. Defendant saw the lights of a car facing the wrong way and angled on the road. Defendant's reaction was to try to go through the opening between the car parked on the right shoulder at a diagonal position and the car that was obstructing the center of the road. Coriz and the accident reconstructionist testified that Defendant drove the van from the left lane to the right lane before attempting to go through the opening. The reconstructionist characterized this movement as a "corrective action" and even as an "evasive action" to avoid hitting the vehicle.

6. At the time of the impact, it was estimated that Defendant was traveling between fifty-four and sixty-two miles per hour. Defendant testified that he did not brake because he thought he would have better control over the vehicle if he did not have the brakes locked. Defendant admitted that he did not see the initial accident scene until he was only a few hundred feet from it and that he did not "attend to everything" while he was driving.

7. Kumagai remembered Coriz waiving his arms and yelling as he stood between her car and the headlights of Castillo's car. Castillo testified that she reached in her car to flash her lights as Defendant's van approached, but does not know if she succeed-

ed. Coriz pushed Castillo away from the van's path, and then dodged the van himself.

8. When the van hit the rear of Kumagai's car, Bright, who was standing in the road talking with Cornell, was thrown about twenty feet. The van became airborne, spun around clockwise, and landed on the hood of Cornell's parked car. Cornell and her passenger were not injured. Kumagai's son, Steven Kumagai, was killed.

9. Defendant was indicted for homicide by vehicle for the death of Steven Kumagai and two counts of great bodily harm by vehicle for injuries to Brenda Kumagai and Bright. At trial, the State proffered an instruction for involuntary manslaughter by careless driving as a "lesser[-]included" offense of homicide by vehicle. Defendant objected to the State's requested jury instruction and argued that under *Santillanes v. State*, 115 N.M. 215, 849 P.2d 358 (1993), a showing of criminal negligence, not civil negligence in the form of careless driving, is necessary for a felony conviction. Defendant further argued that our legislature intended to preempt the involuntary manslaughter statute in motor vehicle cases when it enacted the homicide by vehicle statute and that involuntary manslaughter could therefore not be a lesser included offense of homicide by vehicle. Defendant also proffered his own jury instructions on "civil proximate cause" and "independent intervening cause" which the trial court rejected. The trial court accepted the State's instruction and instructed the jury on a civil negligence standard based on the careless driving statute.[1] That instruction read as follows:

For you to find [Defendant] guilty of Involuntary Manslaughter as a lesser[-]included offense of Homicide by Vehicle, the [S]tate must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1. [Defendant] operated a motor vehicle on a highway in a careless, inattentive,

---

1. New Mexico's careless driving statute states:
   A. Any person operating a vehicle on the highway shall give his full time and entire attention to the operation of the vehicle.
   B. Any person who operates a vehicle in a careless, inattentive or imprudent manner,

without due regard for the width, grade, curves, corners, traffic, weather and road conditions and all other attendant circumstances is guilty of a misdemeanor.
NMSA 1978, § 66–8–114 (Repl.Pamp.1994).

or imprudent manner without due regard for the width, grade, curves, corners, traffic, weather, road conditions[,] and all other attendant circumstances;

2. The act of [Defendant] caused the death of Steven Kumagai;

3. This happened in New Mexico on or about the 26th day of August, 1990.

10. Defendant was convicted of the purported lesser-included offense of involuntary manslaughter by careless driving. "Involuntary manslaughter" is defined as "manslaughter committed in the commission of an unlawful act not amounting to [a] felony, or in the commission of a lawful act which might produce death in an unlawful manner or without due caution and circumspection." NMSA 1978, § 30-2-3(B) (Repl.Pamp.1994). "Manslaughter is the unlawful killing of a human being without malice." Section 30-2-3.

*DISCUSSION*

I. *Requirement of Criminal Negligence*

11. We begin with Defendant's contention that it is reversible error and a denial of due process for careless driving—which requires a finding of only civil negligence—to be the basis for a felony involuntary manslaughter conviction. In order to determine whether a showing of criminal negligence is required for a felony involuntary manslaughter conviction, we review the historical treatment of involuntary manslaughter convictions by our appellate courts.

12. In the past, New Mexico appellate courts required that a defendant's conduct be criminally negligent, or reckless, wanton, or willful in order to be convicted of involuntary manslaughter for causing the death of another by motor vehicle. In *State v. Harris*, 41 N.M. 426, 70 P.2d 757 (1937), where the defendant accidentally struck and killed a pedestrian, our Supreme Court adopted an Illinois Supreme Court rule stating that " 'an injury caused by mere negligence, not amounting to a reckless, willful, and wanton disregard of consequences to others, cannot be made the basis of a criminal action.' " *Id.* at 428, 70 P.2d at 758 (quoting *People v. Allen*, 321 Ill. 11, 151 N.E. 676, 679 (1926)). Similarly, in *State v. Sisneros*, 42 N.M. 500,

82 P.2d 274 (1938), where the defendant struck and killed a man pumping air into the tire of his car on the side of the highway, our Supreme Court reiterated that "[i]t was incumbent upon the state to prove criminal negligence" in order to convict the defendant of involuntary manslaughter. *Id.* at 511, 82 P.2d at 281.

13. Thereafter, our Supreme Court adhered to the standard adopted in *Harris*, stating, in *City of Raton v. Rice*, 52 N.M. 363, 365, 199 P.2d 986, 987 (1948), that, in the context of involuntary manslaughter by reckless driving, ordinary negligence "not amounting to wilful or wanton disregard of consequences cannot be made the basis of a criminal action." The Supreme Court went on to say that " '[m]ere negligence is not sufficient. It may be sufficient to compel the driver to respond in damages. However, when it comes to responding to an accusation of involuntary manslaughter, with the possibility of a penitentiary sentence, a different rule is called into play.' " *Id.* (quoting *Sisneros*, 42 N.M. at 513, 82 P.2d at 281 (Zinn, J., concurring)); *see also State v. Hayes*, 77 N.M. 225, 421 P.2d 439 (1966) (holding that neither high speed alone nor speed accompanied by other negligent acts are sufficient to sustain involuntary manslaughter conviction); *State v. Deming*, 66 N.M. 175, 344 P.2d 481 (1959) (upholding involuntary manslaughter conviction where there was sufficient evidence that defendant was driving in an unsafe manner and under the influence of intoxicating liquor); *State v. Clarkson*, 58 N.M. 56, 60, 265 P.2d 670, 672 (1954) (showing of wanton and reckless operation of an automobile required to convict defendant of involuntary manslaughter).

14. It was not until *State v. Grubbs*, 85 N.M. 365, 512 P.2d 693 (Ct.App.1973), that the foundation was laid for applying a civil negligence standard to an involuntary manslaughter conviction, although not in the context of a vehicular killing. In *Grubbs*, the defendant shot and killed the decedent and was convicted of involuntary manslaughter by an unlawful act not amounting to a felony. *Id.* at 366, 512 P.2d at 694. The unlawful act was the negligent use of a weapon under what is now NMSA 1978, Section 30-7-

4(A)(3) (Repl.Pamp.1994). *Grubbs*, 85 N.M. at 366, 512 P.2d at 694. The *Grubbs* Court distinguished *Clarkson* and *Hayes* on the grounds that neither case discussed the application of the criminal negligence standard to the unlawful act portion of the involuntary manslaughter statute and that those cases involved vehicular killings. *Id.* at 367, 512 P.2d at 695. The *Grubbs* Court upheld the defendant's conviction, holding that the word "negligent" in the "negligent use of a deadly weapon" statute was to be given its ordinary meaning because the legislature failed to indicate that it intended a different construction of the term. *Id.* at 368, 512 P.2d at 696.

15. After *Grubbs*, application of the civil negligence standard was extended to child abuse cases, because New Mexico appellate courts interpreted the child abuse statute as a strict liability crime due to the compelling state interest in protecting children. *See State v. Lucero*, 98 N.M. 204, 206, 647 P.2d 406, 408 (1982) (holding that because there is a compelling public interest in preventing harm to children, child abuse is a strict liability crime and criminal intent is not required); *State v. Lucero*, 87 N.M. 242, 244, 531 P.2d 1215, 1217 (Ct.App.) (intimating that state has authority to make a negligent act a crime, particularly where there is a strong public interest in protecting children), *cert. denied*, 87 N.M. 239, 531 P.2d 1212 (1975); *see also State v. Crislip*, 110 N.M. 412, 796 P.2d 1108 (Ct.App.) (tacitly approving civil negligence standard for child abuse prosecution), *cert. denied*, 110 N.M. 260, 794 P.2d 734 (1990) *and overruled by Santillanes*, 115 N.M. at 225 n. 7, 849 P.2d at 368 n. 7; *cf. State v. Coe*, 92 N.M. 320, 321, 587 P.2d 973, 974 (Ct.App.) (indicating that something more than ordinary negligence required for conviction under child abuse statute but not adopting the criminal negligence standard),

*cert. denied*, 92 N.M. 353, 588 P.2d 554 (1978), *and overruled by Santillanes*, 115 N.M. at 225 n. 7, 849 P.2d at 368 n. 7.

16. More recently, our Supreme Court retreated from precedent and held that the element of negligence as used in the child abuse statute [2] requires a showing of criminal negligence and not ordinary civil negligence. *Santillanes*, 115 N.M. at 222, 849 P.2d at 365. Thus, to satisfy the element of negligence in the child abuse statute, proof is required "that the defendant knew or should have known of the danger involved and acted with a reckless disregard for the safety or health of the child." *Id.*

17. We believe that the rationale used to adopt a criminal negligence standard for the child abuse statute in *Santillanes* applies to any crime punishable as a felony. In *Santillanes*, our Supreme Court repeatedly refers to the distinction that crimes punishable as petty misdemeanors properly require a showing of only ordinary civil negligence, while more serious crimes punishable as felonies should reflect a higher mental state. For example, our Supreme Court stated: "We can find no clearly articulated basis for the rationale in *[City of] Raton v. Rice* except for the intuitive notion that a higher standard than tort negligence should be applied when the crime is punishable as a felony." *Id.* at 220, 849 P.2d at 363. Thereafter, the Court noted that commentators' rationale for the application of a criminal negligence standard for felonies, rather than an ordinary civil negligence standard, was reached "by relying on common-sense justifications based upon the traditional application of heightened standards of culpability to crimes punishable with jail sentences." *Id.*

18. The *Santillanes* Court further distinguished between public welfare, or regulatory crimes, which are strict liability crimes

---

2. New Mexico's child abuse statute states, in part:

> C. Abuse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be:
> (1) placed in a situation that may endanger the child's life or health;
> (2) tortured, cruelly confined or cruelly punished; or

> (3) exposed to the inclemency of the weather.
> Whoever commits abuse of a child which does not result in the child's death or great bodily harm is, for a first offense, guilty of a third degree felony and for second and subsequent offenses is guilty of a second degree felony. If the abuse results in great bodily harm or death to the child, he is guilty of a first degree felony.

NMSA 1978, § 30–6–1(C) (Repl.Pamp.1994).

with minimal punishment, and serious nonregulatory crimes which "generally proscribe conduct manifesting moral culpability." *Id.* at 222, 849 P.2d at 365. In doing so, the Court analogizes to other New Mexico statutes which also contain "negligence" as an element without defining the term. *Id.* The Court cites, for example, the negligent use of a deadly weapon statute, § 30–7–4, for the purpose of illustrating that crimes punishable as petty misdemeanors properly require a showing of only ordinary civil negligence. *Santillanes,* 115 N.M. at 222, 849 P.2d at 365. Conversely, crimes punishable as a felony with the possibility of a jail sentence, should require something beyond mere civil negligence. "In other words, when moral condemnation and social opprobrium attach to the conviction of a crime, the crime should typically reflect a mental state warranting such contempt." *Id.* The Court stated in sum, "we find this concept firmly rooted in our jurisprudence: When a crime is punishable as a felony, civil negligence ordinarily is an inappropriate predicate by which to define such criminal conduct." *Id.*

19. Hence, although *Santillanes* specifically dealt with the child abuse statute, we interpret that case as requiring a showing of criminal negligence for violation of any statute punishable as a felony. Here, Defendant was convicted under the "unlawful act" portion of the involuntary manslaughter statute. Conviction under the "unlawful act" portion of the statute requires proof of a predicate offense which "probably includes any act punishable as a crime, including misdemeanors and ordinance violations." SCRA 1986, 14–230, Committee Commentary. We interpret *Santillanes* as requiring a standard of negligence which coincides with the punishment. In other words, a petty misdemeanor, such as negligent use of a deadly weapon, properly requires a showing of only ordinary civil negligence. However, when used as the basis for involuntary manslaughter, a petty misdemeanor is elevated to a felony and as such requires a showing of criminal negligence. Consequently, we interpret *Santillanes* as implicitly overruling *Grubbs.* To the extent that Judge Bivins' special concurrence in *State v. Franklin,* 116 N.M. 565, 865 P.2d 1209 (Ct.App.1993), interprets *Santillanes* as requiring a showing of only civil negligence for involuntary manslaughter by negligent use of a firearm, *id.* at 573, 865 P.2d at 1217 (construing *Santillanes,* 115 N.M. at 222; 849 P.2d at 365), we disagree and hold otherwise.

20. Moreover, the "lawful act" portion of the involuntary manslaughter statute, § 30–2–3(B), includes "[t]he statutory phrase 'without due caution and circumspection' [which] involves the concept of 'criminal negligence.' Criminal negligence includes conduct which is reckless, wanton, or willful." *State v. Arias,* 115 N.M. 93, 96, 847 P.2d 327, 330 (Ct.App.1993) (citation omitted). Therefore, we hold that a showing of criminal negligence is required for conviction of involuntary manslaughter, whether based on the "unlawful act" or "lawful act" portion of the statute, and irrespective of the underlying statutory basis for the conviction. It follows that involuntary manslaughter cannot be based upon violation of the careless driving statute, which requires a showing of only civil negligence. *See* § 66–8–114(B). Consequently, the State's contention that involuntary manslaughter by careless driving is a lesser-included offense of homicide by vehicle under the posture of this case, must fail. The Supreme Court of Massachusetts reached a similar result in construing its state statutes. *See Commonwealth v. Jones,* 382 Mass. 387, 416 N.E.2d 502, 507 (1981) (declining to hold that vehicular homicide is a lesser-included offense of manslaughter).

21. In addition, we do not interpret *State v. Yazzie,* 116 N.M. 83, 860 P.2d 213 (Ct.App. 1993), as being inconsistent with our holding. We reject the State's contention that *Yazzie* stands for the proposition that careless driving can be the basis for an involuntary manslaughter conviction. In *Yazzie,* the issue was whether the defendant could be convicted of homicide by vehicle, based upon the misdemeanor of careless driving. We determined that the homicide by vehicle statute set out only four specific circumstances under which an individual can be convicted and careless driving is not one of them. *Id.* at 85, 860 P.2d at 215. Accordingly, we held that "there is no such crime as homicide by

vehicle by careless driving." *Id.* The alternative charge in *Yazzie* was involuntary manslaughter by careless driving, a felony, which Yazzie did not challenge, and which we therefore upheld. Yazzie did not argue, as Defendant does here, that involuntary manslaughter cannot be based on careless driving and that the homicide by vehicle statute preempted the field. Therefore, we never addressed the issue of whether a defendant can be convicted of involuntary manslaughter by careless driving. For this reason, *Yazzie* should be narrowly construed to the precise question decided therein.

22. Finally, because we conclude that involuntary manslaughter cannot be based upon a violation of the careless driving statute, we also hold that the trial court erred in giving such an instruction and reverse Defendant's conviction. Accordingly, we need not address Defendant's alternative argument that the trial court erred in refusing his proffered instructions.

II. *Preemption by the Homicide by Vehicle Statute*

23. Because we reverse Defendant's conviction, we must next determine whether Defendant can be retried for involuntary manslaughter under a *criminal* negligence standard. To make that determination, we discuss whether the specific homicide by vehicle statute, NMSA 1978, § 66–8–101 (Repl. Pamp.1994), preempts the conviction of death by motor vehicle cases under the general involuntary manslaughter statute, § 30–2–3.

24. Prior to the enactment of the first homicide by vehicle statute in 1978, the sole statute dealing with vehicular killings was the general involuntary manslaughter statute. The present homicide by vehicle statute sets forth only four predicate offenses for conviction as third degree felonies. *See* § 66–8–101(C), (F); *Yazzie*, 116 N.M. at 85, 860 P.2d at 215. In *Yazzie*, we determined those four predicate offenses to be:

(1) driving under the influence of intoxicating liquor, (2) driving under the influence of any drug, (3) violating NMSA 1978, Section 66–8–113 (Repl.Pamp.1987) (reckless driving), or (4) violating NMSA 1978, Section 30–22–1(C) (Repl.Pamp.1984) (willfully refusing to come to a stop when so directed by a uniformed officer in a marked police vehicle).

*Yazzie*, 116 N.M. at 85, 860 P.2d at 215. Each of these predicate offenses requires a showing of something beyond mere civil negligence. *See* SCRA 1986, 14–241; SCRA 1986, 14–240, –243 (Cum.Supp.1994).

25. Because New Mexico courts have consistently construed the involuntary manslaughter statute as requiring a degree of culpability beyond mere civil negligence, the enactment of the homicide by vehicle statute, in essence, codified the restrictions from our case law to the extent that a violation of the Motor Vehicle Code in a negligent manner, but not rising to the level of criminal negligence or recklessness, cannot be a felony in the event of death. Consequently, it should be of no surprise that the homicide by vehicle statute excludes careless driving and the violation of the speeding laws as predicate offenses because neither requires criminal negligence. In fact, the statute specifically states that "violation of speeding laws set forth in the Motor Vehicle Code ... shall not per se be a basis for violation of Section 66–8–113 NMSA 1978 [reckless driving]." Section 66–8–101(C).

26. For this reason, we believe that by codifying decades of judicial case law and incorporating it into the homicide by vehicle statute, our legislature declared an intent to require that prosecutions for unintentional homicide by operation of a motor vehicle be brought only under the homicide by vehicle statute. To this end, the official commentary to our Uniform Jury Instructions states that: "Accidental homicide by vehicle is now a specific crime and must be charged rather than manslaughter." *See* SCRA 14–230, Committee Commentary. We construe the more specific and recent homicide by vehicle statute to govern prosecutions for death by motor vehicle cases.

27. The general/specific statute rule further supports the conclusion that prosecutions for unintentional vehicular killings should be brought under the homicide by vehicle statute. That rule as articulated in *State v. Blevins,* 40 N.M. 367, 60 P.2d 208

(1936), and reaffirmed in *State v. Ibn Omar–Muhammad,* 102 N.M. 274, 694 P.2d 922 (1985), states:

> It is a fundamental rule that where the general statute, if standing alone, would include the same matter as the special act, and thus conflict with it, the special act will be considered as an exception to the general statute, whether it was passed before or after such general enactment. . . .
>
> . . . .
>
> . . . [T]he State had no alternative in the matter but to prosecute the appellant under the special statute.

*Blevins,* 40 N.M. at 368, 370, 60 P.2d at 209, 210; *Ibn Omar–Muhammad,* 102 N.M. at 277, 694 P.2d at 925. Defendant argues that since the involuntary manslaughter statute, as applied to a vehicular killing, and the homicide by vehicle statute both require the same act and culpability, he should have been charged with the more specific crime of vehicular homicide. We agree.

28. Applying the appropriate test, we determine that here the offenses of involuntary manslaughter and homicide by vehicle are the same. The test, once again articulated in *Blevins* and reiterated in *Ibn Omar–Muhammad,* for determining whether two offenses are the same or separate, is:

> "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one[,] is whether each provision requires proof of an additional fact which the other does not."

*Blevins,* 40 N.M. at 369, 60 P.2d at 210 (quoting *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932)); *Ibn Omar–Muhammad,* 102 N.M. at 277, 694 P.2d at 925 (quoting *Blevins,* 40 N.M. at 369, 60 P.2d at 210) (quoting *Blockburger,* 284 U.S. at 304, 52 S.Ct. at 182)). We have determined that the mental state for involuntary manslaughter is criminal negligence, irrespective of the underlying statutory basis for the conviction. Criminal negligence includes reckless, wanton, or willful disregard of the consequences. *See Arias,* 115 N.M. at 96, 847 P.2d at 330. Similarly, "[t]he mental state required for vehicular homicide is that of conscious wrongdoing. Conscious wrongdoing has been defined as the purposeful doing of an act that the law declares to be a crime." *Ibn Omar–Muhammad,* 102 N.M. at 278, 694 P.2d at 926 (citation omitted). Given that the mental states for both crimes are the same, we conclude that the involuntary manslaughter statute does "include the same matter" as the homicide by vehicle statute, and the two offenses are the same. The general/specific rule is therefore applicable, and Defendant should have been charged under the homicide by vehicle statute. Therefore, we hold that the legislature did not intend to permit similar prosecutions under the older, more general statute of involuntary manslaughter. *See State v. Riley,* 82 N.M. 235, 478 P.2d 563 (Ct.App.1970).

29. Because we conclude that the homicide by vehicle statute preempts the involuntary manslaughter statute in unintentional vehicular homicide cases, Defendant here cannot be retried for involuntary manslaughter using the criminal negligence standard. Defendant cannot be retried for homicide by vehicle and great bodily harm by vehicle since the jury has acquitted him of those charges.

*CONCLUSION*

30. In conclusion, we hold that a showing of criminal negligence is required for conviction of homicide by vehicle or involuntary manslaughter. Consequently, there is no such crime as involuntary manslaughter by careless driving. Further, unintentional vehicular killings can no longer be prosecuted under involuntary manslaughter, but must be charged under the more specific statute of homicide by vehicle. Accordingly, we reverse Defendant's conviction.

31. IT IS SO ORDERED.

APODACA, C.J., and DONNELLY, J., concur.