581 P.2d 27
STATE of New Mexico,
Plaintiff-Appellee,

v.

Richard R. BARBER and David L.
Harris, Defendants-Appellants.

No. 3447.

Court of Appeals of New Mexico.

June 6, 1978.

Scott M. Curtis, Cooney & Curtis, Farmington, for defendants-appellants.

Toney Anaya, Atty. Gen., Robert G. Sloan, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

OPINION

HENDLEY, Judge.

Convicted of hunting by spotlight or artificial light contrary to § 53–2–37, N.M.S.A. 1953 (Repl. Vol. 8, 1962, pt. 1), defendants appeal asserting: (1) the statute is unconstitutional; and, (2) the state failed to prove criminal intent.

Defendants were observed in a vehicle equipped with additional lights mounted on the roll bar above the cab, driving slowly in a random fashion. On at least two occasions they made a 360 degree circle. They were "running out different roads and then came back and would run back on different roads on different occasions." The overhead lights were shining in a wider arc than the headlights. This was in an area where there was big game animals and livestock. The defendants had a loaded rifle and a loaded pistol and were riding in the back of the pickup.

Section 53–2–37, supra, being chap. 171, § 1, Laws 1951 states as follows:

"AN ACT TO PREVENT THE ILLEGAL KILLING OF GAME AND LIVESTOCK BY USE OF SPOTLIGHTS AND OTHER ARTIFICIAL LIGHTS, *MAK-*

*ING IT ILLEGAL TO USE SUCH LIGHTS IN GAME AREAS AND PROVIDING PENALTY FOR VIOLATION OF THIS ACT AND GIVING JUSTICES OF THE PEACE CONCURRENT JURISDICTION IN CASES ARISING UNDER THIS ACT.*

"HOUSE BILL NO. 321; Approved: March 15, 1951

"BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF NEW MEXICO:

"SECTION 1. *It shall be unlawful for any person or one or more of a group of persons together to throw or cast the rays of a spotlight or other artificial light into any field, pasture, woodland, forest or prairie wherein big game or domestic livestock may be, or may be reasonably expected to be, while having in his possession or their possession or under control a firearm or other implement whereby any big game animal or domestic animal could be killed by aid of an artificial light*; provided, however, that all officers authorized to enforce the game and livestock laws of the State of New Mexico and all landowners or lessees, while on their own lands in connection with their legitimate activities, and employees of such landowners and lessees shall be exempt from the provisions of this Act." (Emphasis Ours)

Defendants contend that the statute ". . . prohibits both legal and illegal acts, makes an innocent act a crime and criminals of those who might perchance fall within its interdiction. . . ." It is on this ground that defendants contend the act ". . . should be declared void for uncertainty. . . ."

Defendants concede that the legislature may forbid the doing of an act and make its commission criminal without requiring criminal intent but in so doing it must clearly appear, either by language or clear inference, that such was the legislative intent. *State v. Craig,* 70 N.M. 176, 372 P.2d 128 (1962); *State v. Shedoudy,* 45 N.M. 516,

118 P.2d 280 (1941); see *State v. Vickery,* 85 N.M. 389, 512 P.2d 962 (Ct.App.1973).

Whether criminal intent is to be regarded as essential is a matter of construction. *State v. Shedoudy,* supra. We examine two aspects. First, the public interest; and, second, the legislative intent.

The usual rationale for such statutes is that the public interest in the matter is so compelling or that the potential for harm is so great that the interests of the public must override the interests of the individual. *State v. Lucero,* 87 N.M. 242, 531 P.2d 1215 (Ct.App.1975); see *Morisette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952).

What are public interests? The Thirty-Ninth Fiscal Year Annual Report of the Department of Fish and Game states at page 9:

"4. The fourth bill passed was House Bill No. 321 which will appear as Chapter 171 of the Session Laws. This is known as the Spotlight Act and will give law enforcement officers an even break with the despicable law violators who for years have persisted in hunting out of season at night with spotlights. Despite the fact that some hunters have expressed the fear that this law could be used to seriously interfere with legitimate use of lights around camps, etc., positively no such danger exists and all must rest assured that the law is meant for and will be used on the violator only."

It was not until the Sixty-Fourth Fiscal Year that any meaningful attempt was made to determine the number of deer and antelope illegally taken. The following is taken from pages 49 and 52 of the Sixty-Fifth Annual Report of Department of Fish and Game:

"The second completed project was also federally funded, and involved personnel of both the Enforcement and Game and Management Divisions. Though much of this study took place during the 1975–1976 fiscal year, the project could not be reported before this because its success

depended on its being kept confidential. A man from outside the Department was hired to simulate the activities of a poacher. His simulated violations, combined with existing data on violations and citations, enabled us to project New Mexico's annual illegal harvest of deer and antelope during closed season. As many as 34,000 deer and 3,000 antelope may be victims of the poacher. In the case of deer, this far exceeds our annual legal harvest. New Mexico's game herds cannot continue to tolerate such a situation.

"Possibly even more shocking and important was the apparent ease with which this operative was able to accomplish his task in public view. He recorded 43 incidents in which someone saw him committing a blantantly illegal act. Only once, however, were his actions reported to enforcement authorities and then only because the viewer thought our agent had killed a domestic calf instead of an antelope. The results indicate the public condoned the game law violations they witnessed."

It is estimated that more than three million dollars is lost each year in poaching. See Report by Dan Pursley, Enforcement Research Specialist, Department of Game and Fish, *Illegal Big Game Harvest During Closed Season.*

The illegal taking of big game is of no recent concern to New Mexico. See Laws of 1912, chap. 85, § 19, which prohibited the taking of protected animals, birds or fish by the use of any "artificial light or similar device whatever." This section was subsequently amended by the Laws of 1915, chap. 101, § 11 but retained the above language. The Laws of 1931, chap. 117, repealed the above section and not totally inconsistent with the foregoing enacted § 3 which authorized the State Game Commission to adopt and promulgate regulations to define game animals, establish seasons and to prescribe the manner, methods, and devices which may be used in hunting game animals.

Similarly the livestock industry is and has been of tremendous importance to the economy of New Mexico. A joint publication by the Bank of New Mexico and the Bureau of Business and Economic Research of the University of New Mexico, *The Economy 1976,* p. 12 states:

"The sale of livestock and livestock products continued to comprise a large portion of the agricultural income of New Mexico with 73.2 percent of total agricultural revenues."

The publication goes on to state that cash receipts for livestock and livestock products were $534,743,000 in 1976.

Losses of livestock are in the thousands annually. Records of the New Mexico Livestock Board for the year 1977 shows the following:

"Livestock reported missing to the Livestock Board, Statewide: 5,281 Head Value $1,976,181.00.

"Livestock recovered and returned by the Livestock Board, Statewide: 4,270 Head Value $605,574.00."

There is no reason to believe that the percentage of loss was any less in previous years. Thus, it is apparent that big game and livestock form a significant part of the New Mexico economy.

■ Several of our statutes have been held not to require criminal intent. See *Territory v. Harwood,* 15 N.M. 424, 110 P. 556 (1910); *State v. Vickery,* supra; *State v. Gunter,* 87 N.M. 71, 529 P.2d 297 (Ct.App. 1974); *State v. Lucero,* supra. The emphasis of those statutes was usually upon achievement of a social betterment rather than the punishment of a crime. *United States v. Balint,* 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922). Thus, the policy of the law may, in order to stimulate proper care, require the punishment of the negligent person though he be ignorant of the character of his act. Harring, *Liability Without Fault : Logic and Potential of a Developing Concept,* 1970 Wis.L.Rev. 1201; Sayre, *Public Welfare Offenses,* 33 Columbia L.Rev. 55 (1933).

It is apparent that neither the title of the act nor the act itself requires any criminal intent. Given the foregoing public interest involved and further given the difficulties involved in the protection of big game animals and livestock together with the apparent general public attitude we hold that it clearly appears that the legislature intended to eliminate the element of criminal intent. The doing of the act is what is prohibited. See *State v. Lassiter*, 13 N.C.App. 292, 185 S.E.2d 478 (1971). This does not violate due process. *United States v. Balint,* supra. The act is not void for uncertainty.

Affirmed.

IT IS SO ORDERED.

WOOD, C. J., and HERNANDEZ, J., concur.