1996–NMSC–068

930 P.2d 131

**STATE of New Mexico, Plaintiff–Petitioner,**

v.

**Kenneth YARBOROUGH, Defendant–Respondent.**

**No. 23218.**

Supreme Court of New Mexico.

Nov. 27, 1996.

Tom Udall, Attorney General, M. Anne Wood, Assistant Attorney General, Santa Fe, for Petitioner.

T. Glenn Ellington, Chief Public Defender, Susan Roth, Assistant Public Defender, Santa Fe, for Respondent

Freedman, Boyd, Daniels, Peifer, Hollander, Guttmann & Goldberg, P.A. Charles W. Daniels, Albuquerque, for amici curiae NMCDLA, NMTLA, NMDLA, & NACDL.

## OPINION

RANSOM, Justice.

1. A van driven by Kenneth Yarborough collided with a parked car, killing one of its occupants, Steven Kumagai, and injuring two other people. Yarborough was charged with homicide by vehicle by reckless driving. NMSA 1978, § 66–8–101 (Repl.Pamp.1994) (homicide by vehicle); NMSA 1978, § 66–8–113 (Repl.Pamp.1994) (reckless driving). He also was charged with two counts of great bodily harm by vehicle. NMSA 1978, § 66–8–101(B) (bodily injury by vehicle); NMSA 1978, § 30–1–12 (Repl.Pamp.1994) (defining "great bodily harm"). He was acquitted of all these charges. However, he was convicted of involuntary manslaughter by careless driving, on which the jury was instructed as a lesser-included offense of homicide by vehi-

cle by reckless driving. NMSA 1978, § 30–2–3(B) (Repl.Pamp.1994) (manslaughter); NMSA 1978, § 66–8–114(B) (Repl. Pamp.1994) (careless driving).

2. Yarborough appealed this conviction to the Court of Appeals, arguing that a showing of criminal negligence, not the mere imprudence of careless driving, is required for a fourth-degree-felony conviction of involuntary manslaughter. He argued, further, that the specific homicide by vehicle statute, under which he was acquitted, precluded prosecution under the general involuntary-manslaughter statute under which he was convicted in this fatal vehicular accident. The Court of Appeals agreed with both arguments and reversed the conviction. *State v. Yarborough,* 120 N.M. 669, 905 P.2d 209 (Ct.App.), *cert. granted,* 120 N.M. 636, 904 P.2d 1061 (1995). We granted the State's petition for certiorari pursuant to NMSA 1978, Section 34–5–14 (Repl.Pamp.1990). We now affirm the Court of Appeals.[1]

3. *Facts and proceedings.* This case involves a multiple-car accident on Interstate 25 between Santa Fe and Albuquerque. At about one o'clock in the morning, Angelita Castillo entered the southbound lanes of the interstate heading north, apparently under the mistaken impression that she was on a frontage road. She sideswiped the vehicle of Gretchen Bright who was southbound. Castillo's vehicle came to rest in the middle of the southbound lanes, with its headlights pointing north toward oncoming traffic. Bright's vehicle came to rest on the west shoulder. Neither woman was significantly injured, and both exited their vehicles and began to argue.

4. Jill Cornell pulled up and parked her car partially on the west shoulder. John Coriz also arrived on the scene and parked his car off the road. He then tried to calm Castillo and Bright, instructing them not to move their vehicles. Castillo and Coriz argued about whether Castillo's car should be moved from the center of the road. Brenda

Kumagai was southbound with her three sons. She saw the accident scene from approximately one mile away, approached with caution, and stopped well short of the scene. Kumagai then slowly moved closer, pulling behind Cornell's car. She parked partially on the west shoulder, and partially in the roadway. Kumagai tried to speak to Coriz, but he immediately began to waive his arms and scream at another approaching vehicle.

5. Kenneth Yarborough and his girlfriend, Victoria Bertch, were traveling south towards Albuquerque in his van. Yarborough testified that he did not see the accident until he was within a couple hundred feet and that he decided not to apply his brakes because he believed he would have more control if they did not lock. He tried to drive through the accident scene and his van struck the back of Kumagai's stationwagon at an estimated speed of fifty-four to sixty-two miles per hour, knocking the stationwagon into Cornell's car. Four-year-old Steven Kumagai was in the back of the Kumagai stationwagon and died shortly after the accident as a result of severe head and neck injuries.

6. Yarborough failed a field sobriety test administered by a police officer. Several witnesses testified that Yarborough appeared intoxicated. A partially filled bottle of vodka and plastic cups filled with ice and vodka were found in the van. Yarborough was indicted on one count of homicide by vehicle, § 66–8–101(A), and, for injuries to Gretchen Bright and Brenda Kumagai, two counts of great bodily harm by vehicle, § 66–8–101(B); § 30–1–12. At his jury trial, Yarborough admitted that he did not "attend to everything" while he was driving. Based on this admission, the State tendered a jury instruction for the offense of involuntary manslaughter by careless driving, arguing that it is a lesser-included offense of homicide by vehicle. After some debate, the trial court gave this instruction, and Yarborough was

1. Justice Minzner heard oral argument but thereafter recused from further participation upon discovering she had authored a memorandum opinion as a member of the Court of Appeals involving the same defendant and the same charges. *See State v. Yarborough,* No. 13,815 (N.M.Ct.App. Dec. 15, 1992) (reversing the district court's order excluding all of the evidence of driving while intoxicated); *see also* NMRA 21–400(A)(4) (1996) (governing recusal when judge has participated in an official capacity in an inferior court).

**598**

convicted of involuntary manslaughter by careless driving and was acquitted of all the other charges. Yarborough appealed.

7. Reversing the conviction of involuntary manslaughter by careless driving, the Court of Appeals held that a felony conviction cannot be based upon a misdemeanor traffic violation, careless driving, which requires only a showing of civil negligence. Relying on our opinion in *Santillanes v. State*, 115 N.M. 215, 222–23, 849 P.2d 358, 365–66 (1993), the Court held that a showing of criminal rather than civil negligence is required. Additionally, the Court held that Yarborough could not be retried for involuntary manslaughter using a criminal-negligence standard because the homicide by vehicle statute, under which Yarborough was acquitted, is a specific statute to the exclusion of the general involuntary-manslaughter statute.

8. *Involuntary manslaughter.* Under the criminal code, involuntary manslaughter is the "killing of a human being without malice . . . in the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death in an unlawful manner or without due caution and circumspection." Section 30–2–3(B). As a result of the structure of this section, "[t]here are three separate courses of conduct that constitute involuntary manslaughter: one, the commission of an unlawful act not amounting to a felony; two, the commission of a lawful act that might produce death, in an unlawful manner; and three, the commission of a lawful act that might produce death without due caution and circumspection." *State v. Taylor*, 107 N.M. 66, 70, 752 P.2d 781, 785 (1988), *overruled on*

*other grounds by Gallegos v. Citizens Ins. Agency*, 108 N.M. 722, 731, 779 P.2d 99, 108 (1989). This crime is a fourth-degree felony. Section 30–2–3(B).

9. —*The State's position.* The State alleges that it was proper to convict Yarborough of this felony because his actions amounted to the "commission of an unlawful act not amounting to a felony." It argues that it is improper for the Court of Appeals to have applied the language "without due caution and circumspection" to the "unlawful act" provision of the involuntary-manslaughter statute.[2] The State asserts that the Court of Appeals cannot engraft one part of a statute onto another, and has noted that we previously have held that

> [a] statute must be read and given effect as it is written by the Legislature, not as the court may think it should be or would have been written if the Legislature had envisaged all the problems and complications which might arise in the course of its administration. . . . Courts must take the act as they find it and construe it according to the plain meaning of the language employed.

*State ex rel. Helman v. Gallegos*, 117 N.M. 346, 352, 871 P.2d 1352, 1358 (1994) (quoting *Perea v. Baca*, 94 N.M. 624, 627, 614 P.2d 541, 544 (1980) (in turn quoting *Burch v. Foy*, 62 N.M. 219, 223, 308 P.2d 199, 202 (1957))). Under the statutory construction suggested by the State, "without due caution and circumspection" would modify only the "lawful act" provision of the statute. *See* § 30–2–3(B). Neither the Court of Appeals in its opinion nor the defendant in his answer suggested differently. We note further that the "unlawful act" provision of the involuntary-

---

2. This raises an issue that was not fully addressed by the parties. In this case, Yarborough was charged with the "unlawful act" part of the involuntary manslaughter statute, but it seems equally plausible that he could be charged under the "lawful act which might produce death in an unlawful manner" part. Yarborough was operating a motor vehicle, a lawful act, in a manner that produced the death of another. A review of the caselaw in this area reveals that there is no uniformity in the application of this section. In at least one case the defendant was charged under the "lawful act . . . unlawful manner" provision. *State v. Harris*, 41 N.M. 426, 70 P.2d 757 (1937) (criminal charge not indicated in opinion

but present in record). In another case the defendant was charged under the "unlawful act not amounting to a felony" provision. *State v. Deming*, 66 N.M. 175, 177, 344 P.2d 481, 482 (1959). In at least two other cases, the defendant was charged under *both* provisions. *State v. Clarkson*, 58 N.M. 56, 265 P.2d 670 (1954) (criminal charges not indicated in opinion but present in record); *State v. Sisneros*, 42 N.M. 500, 82 P.2d 274 (1938). It seems unlikely that similar conduct can be lawful in one case and unlawful in another case. However, we need not decide this question in light of our resolution of the criminal negligence requirement for the "unlawful act not amounting to a felony" section.

manslaughter statute does not contain any language connoting negligence.

10. The State directs this Court to *Commonwealth v. Jumper*, 511 Pa. 446, 515 A.2d 540, 541 (1986), for the proposition that other jurisdictions have allowed similar convictions for involuntary manslaughter based on civil negligence. In *Jumper* the defendant was convicted of misdemeanor vehicular homicide when he went through a red light and caused the death of another motorist. *Id.*, 515 A.2d at 540. The *Jumper* court affirmed the vehicular homicide conviction, stating that

> [u]nder the homicide by vehicle statute, culpability is to be determined in each given case in light of the particular facts surrounding the Vehicle Code violation on which the homicide by vehicle charge is predicated, and a determination must be made as to whether death was a probable consequence of the defendant's conduct.

*Id.* at 541. In other words, the Court apparently looked beyond the requirements of the underlying offense, ordinary negligence, to determine if the death was "a probable consequence" of this particular defendant's action. As we note later, this view has been expressed by a few other jurisdictions, and it represents a minority view that has merit— as long as the jury is properly instructed that the probable consequences of the defendant's actions were obvious. The Pennsylvania Supreme Court in *Commonwealth v. Heck*, 517 Pa. 192, 535 A.2d 575, 579 (1987), decided after *Jumper*, held the contrary view that a showing of criminal negligence is required for vehicular homicide.

■ 11. *—The misdemeanor-manslaughter rule.* The "unlawful act" course of conduct embodies the "misdemeanor-manslaughter rule" under which a criminal defendant is guilty of a felony for killing a human being while in the commission of a misdemeanor. Wayne R. LaFave & Austin W. Scott, *Substantive Criminal Law* § 7.13(a), at 288 (1986); Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 108 (3d ed. 1982); Charles E. Torcia, *Warton's Criminal Law* § 168 (15th ed. 1994). As with the felony-murder rule in New Mexico, the involuntary-manslaughter statute does not contain any mention of a culpable state of mind or culpa-

ble degree of conduct. Under an unmodified and traditional misdemeanor-manslaughter rule and a strict reading of Section 30–2–3(B), the violation of *any* misdemeanor would be a sufficient predicate for involuntary manslaughter. In felony murder, however, we have held that a strict reading of the "any felony" language of that statute, NMSA 1978, § 30–2–1(A)(2) (Repl.Pamp.1994), is inappropriate. *E.g., State v. Ortega*, 112 N.M. 554, 562–66, 817 P.2d 1196, 1204–08 (1991).

> To presume conclusively that one who commits *any* felony has the requisite *mens rea* to commit first-degree murder is a legal fiction we no longer can support. In felony murder cases where the felony is a first-degree felony such a presumption is appropriate, but not where the felony is of a lesser degree. This presumption is inappropriate today for lesser-degree felonies where moral, social, and penal considerations dictate that criminal liability should be imposed according to moral culpability. Thus, we now adopt an additional test, the natural and probable cause test ... which has today evolved into what is called the inherently or foreseeably dangerous to human life test. Of the lesser-degree felonies only those known to have a high probability of death may be utilized for a conviction of first-degree murder. Assuming the *actus reus* condition is met, the *mens rea* of one who is committing a felony which is inherently or foreseeably dangerous to human life is sufficient to justify convicting a defendant of felony murder and sentencing him to death or life imprisonment.

*State v. Harrison*, 90 N.M. 439, 442, 564 P.2d 1321, 1324 (1977), *rev'd by rule on other grounds, Tafoya v. Baca*, 103 N.M. 56, 57, 60, 702 P.2d 1001, 1002, 1005 (1985). We look beyond the literal word of the statute to the common-law concept most likely intended by the legislature to be embodied in the statute. *See Gilbert v. United States*, 370 U.S. 650, 655, 82 S.Ct. 1399, 1402, 8 L.Ed.2d 750 (1962) ("[I]n the absence of anything to the contrary it is fair to assume that [the legislative body] used that word in the statute in its common law sense.").

12. As the Court of Appeals set forth, *Yarborough*, 120 N.M. at 672, 905 P.2d at 212, this Court was first presented with this question in *State v. Harris*, 41 N.M. 426, 70 P.2d 757 (1937). The defendant in *Harris* was convicted of involuntary manslaughter, and argued that his conviction was proper only if he had driven his truck recklessly. *Id.* at 427–28, 70 P.2d at 757. We stated that

> in the case of an accidental death of a pedestrian struck by an automobile, where the proof is sufficient to establish, beyond a reasonable doubt, that under the circumstances of the injury the conduct of the driver of the machine was so reckless, wanton, and willful, as to show an utter disregard for the safety of pedestrians, a conviction for manslaughter will be warranted; but an injury caused by mere negligence, not amounting to a reckless, willful and wanton disregard of consequences, cannot be made the basis of a criminal action.

*Id.* at 428, 70 P.2d at 757. Similarly, in *State v. Sisneros*, we held that the involuntary manslaughter statute "contemplates criminal negligence." 42 N.M. 500, 510, 82 P.2d 274, 280 (1938). The defendant in *Sisneros* had accidentally killed two men as they were pumping air into the tire of a car parked on the shoulder of a country road. *Id.* at 504–05, 82 P.2d at 276–77. The conviction was reversed because the prosecution failed to prove criminal negligence, an essential element of the crime. *Id.* at 511–12, 82 P.2d at 281–82. "Mere negligence is not sufficient. It may be sufficient to compel the driver to respond in damages. However, when it comes to responding to an accusation of involuntary manslaughter, with the possibility of a penitentiary sentence, a different rule is called into play." *Id.* at 513, 82 P.2d at 281 (Zinn, J., specially concurring).

13. We have continued to follow the logic of the *Harris* case each time the Court has been presented with the issue of the degree of negligence required for an involuntary-manslaughter conviction arising from an automobile accident. *See State v. Hayes*, 77 N.M. 225, 226, 421 P.2d 439, 439 (1966) (holding that the culpable state of mind for involuntary manslaughter "comprehends evidence of an utter irresponsibility on the part of the defendant or of a conscious abandonment of any consideration for ... safety"); *State v. Clarkson*, 58 N.M. 56, 60, 265 P.2d 670, 672 (1954) (stating that "[t]he wanton and reckless operation of an automobile which must be shown as the proximate cause of a death in order to secure a conviction for involuntary manslaughter where a human is killed by an automobile being driven by another is not different from that required to be shown under our guest statute"); and *City of Raton v. Rice*, 52 N.M. 363, 365, 199 P.2d 986, 987 (1948) (stating that "[n]egligence, not amounting to wilful or wanton disregard of consequences [,] cannot be made the basis of a criminal action").

14. The misdemeanor-manslaughter rule, without the qualification of criminal negligence, has fallen into disfavor in many jurisdictions. *See* Torcia, *supra*, § 168 ("The misdemeanor-manslaughter rule has been abandoned in England, the Model Penal Code, and in a growing number of states. Manslaughter is now committed in such jurisdiction, whether the act be lawful or unlawful, only if the death is caused recklessly or with criminal negligence.") (footnotes omitted). Several jurisdictions have found fault with and have chosen to abandon the misdemeanor-manslaughter rule. *See, e.g., State v. Pray*, 378 A.2d 1322, 1323 (Me.1977) (acknowledging that criminal negligence had been required for misdemeanor-manslaughter rule, but choosing to abolish the entire doctrine in Maine); *Commonwealth v. Catalina*, 407 Mass. 779, 556 N.E.2d 973, 978 (1990) (noting the strong trend away from the misdemeanor-manslaughter rule and holding "that unlawful-act manslaughter should be abandoned in Massachusetts except for appropriate cases which are based on the principle that a battery that causes death is manslaughter"). Other jurisdictions require that the predicate misdemeanor for misdemeanor manslaughter be either inherently dangerous or malum in se. *See, e.g., Comber v. United States*, 584 A.2d 26, 50 (D.C.1990) (holding that under the misdemeanor-manslaughter rule, "the category of misdemeanors dangerous in and of themselves encompasses misdemeanors which bear an inherent danger of physical injury");

*Schlossman v. State,* 105 Md.App. 277, 659 A.2d 371, 376 (1994) (holding that the malum in se common-law misdemeanor of intentional battery was a sufficient predicate offense, even though not inherently dangerous, to support a misdemeanor-manslaughter conviction.), *cert. granted,* 340 Md. 649, 667 A.2d 897 (1995), *and cert. dismissed,* 342 Md. 403, 676 A.2d 513 (1996).

15. The majority of jurisdictions require that the predicate offense involves criminal negligence or recklessness. *See, e.g., State v. Puryear,* 121 Ariz. 359, 590 P.2d 475, 479–80 (App.1979) (rejecting the distinction between malum in se and malum prohibitum, and requiring at least criminal negligence for involuntary manslaughter conviction); *People v. Stuart,* 47 Cal.2d 167, 302 P.2d 5, 9 (1956) (holding that a pharmacist could only be criminally liable under the misdemeanor-manslaughter rule if he "had intentionally or through criminal negligence prepared, compounded, or sold an adulterated or misbranded drug" in violation of the statute); *State v. Conner,* 292 N.W.2d 682, 686 (Iowa 1980) (holding that the "General Assembly intended to preserve the common law requirement of recklessness in ... involuntary manslaughter" because only then "is the legislative scheme of sanctions commensurate to culpability carried forward"); *Commonwealth v. Hawkins,* 157 Mass. 551, 32 N.E. 862, 863 (1893) (holding that recklessness, not merely the violation of a city ordinance, must be shown for assault with a firearm conviction); *People v. Datema,* 448 Mich. 585, 533 N.W.2d 272, 281 (1995) (holding that "[a]n unlawful act committed with the intent to injure or in a grossly negligent manner that proximately causes death is involuntary manslaughter" and that "criminal liability is imposed [in the latter instance] because, although the defendant's acts are not inherently wrong, the defendant has acted or failed to act with awareness of the risk to safety and in wilful disregard of the safety of others"); *State v. Hancock,* 248 N.C. 432, 103 S.E.2d 491, 494 (1958) (stating that the mere violation of a traffic safety statute is an insufficient predicate for felonious slaying, that it requires "recklessness of probable consequences of a dangerous nature, when tested by the rule of reasonable prevision"); *State*

*v. Collins,* 67 Ohio St.3d 115, 616 N.E.2d 224, 226 (Ohio 1993) (holding that a "minor-misdemeanor," such as the failure to stop at a stop sign, could not be a predicate offence for misdemeanor-manslaughter because it did not show the necessary intent or recklessness); *Commonwealth v. Heck,* 517 Pa. 192, 535 A.2d 575, 579 (1987) (holding that the state must prove criminal negligence for its homicide by vehicle statute, even though the statute specifically states that any traffic violation is sufficient); *Commonwealth v. Busler,* 445 Pa. 359, 284 A.2d 783, 784 (1971) (concluding that violations of the motor vehicle code are not necessarily the unlawful act contemplated in misdemeanor-manslaughter, and that to sustain a conviction "it must be established that such violation in itself, or together with the surrounding circumstances, 'evidence a disregard of human life or an indifference to consequences'" (quoting *Commonwealth v. Holman,* 160 Pa.Super. 211, 50 A.2d 720, 721 (1947))); *Holder v. State,* 152 Tenn. 390, 277 S.W. 900 (1925) (holding that the misdemeanor-manslaughter rule requires a showing of intent or the commission of an act "in such a manner as to make the killing of deceased a natural or probable result of such conduct"); *State v. Beayon,* 158 Vt. 133, 605 A.2d 527, 528–29 (1992) (holding that a careless driving statute could not be used as a predicate for vehicular homicide because careless driving can occur without criminal negligence); *but see United States v. Walker,* 380 A.2d 1388, 1390 (D.C.1977) (holding that misdemeanor violation of carrying an unlicensed firearm was sufficient, without a showing of recklessness or negligence, for an involuntary manslaughter conviction).

16. Many commentators have noted problems inherent in the misdemeanor-manslaughter rule. In their treatise *Substantive Criminal Law,* Professors LaFave and Scott suggest a fallacy in the misdemeanor-manslaughter rule when applied to mere traffic violations.

There is no logical reason for inflicting manslaughter punishment on one who unintentionally kills another simply because he is committing a traffic violation, unless it makes sense to punish the one-in-a-thousand traffic violations, which by bad luck

produces an unexpected death, far more severely than the nine hundred and ninety-nine violations which happily do not produce any such devastating result. . . .

. . . If the bad result which happens is actually intended, or if it is recklessly produced (especially by one conscious of the risk), it does not seem too harsh to make the severity of his punishment depend somewhat on the actual result, however accidental. Where, however, the result is both unintended and produced without any consciousness of the risk of producing it, it seems too harsh and illogical.

LaFave & Scott, *supra,* § 7.13(e).

17. Similarly, Professors Perkins and Boyce comment upon the degree of conscious intent that is implicitly required in misdemeanor manslaughter, and how that mens rea is absent in the violation of basic traffic regulations.

"Knowingly and intentionally to break a statute must . . . always be morally wrong" and hence will supply the normal mens rea requirement for true crime, at least if the statute was intended for the protection and safety of person or property. Because manslaughter requires this mens rea whereas an ordinary traffic violation does not, it follows that death resulting from such a violation is not necessarily manslaughter.

Perkins & Boyce, *supra,* at 110 (quoting *The Queen v. Tolson,* 23 Q.B. 168, 172 (1889)) (footnotes omitted). *Cf.* Torcia, *supra,* § 170 (stating that in vehicular homicide, "whether the offense is made part of manslaughter or not, it is required that the vehicle be operated with recklessness, criminal negligence, culpable negligence, or gross negligence and that such operation be the proximate cause of the homicide"). These comments lend support to Yarborough's position that the state must prove at least criminal negligence for a misdemeanor manslaughter conviction.

18. —*Santillanes.* Yarborough's position is further supported by this Court's recent decision in *Santillanes v. State,* 115 N.M. 215, 849 P.2d 358 (1993). In *Santillanes,* we interpreted the term "negligence" as contained in the child-abuse statute to impliedly require criminal negligence. *Id.* at 223, 849

P.2d 358. There, we began our analysis by noting that although the legislature "may define certain conduct as criminal without the element of intent[,] . . . we presume criminal intent as an essential element of the crime unless it is clear from the statute that the legislature intended to omit the *mens rea* element." *Id.* at 218, 849 P.2d at 361 (citing *Reese v. State,* 106 N.M. 498, 501, 745 P.2d 1146, 1149 (1987) (Ransom, J., specially concurring)). In the child-abuse statute, negligence was specifically listed as sufficient for criminal liability, but the term was not defined to show whether the legislature intended criminal or civil negligence. NMSA 1978, § 30–6–1(C) (Cum.Supp.1992). We held that criminal negligence was implicitly required for the felony conviction of child abuse, stating that

[w]e do not find the absence of a definition of negligence in the statute indicative of legislative intent, and we are not persuaded by the State's contention that when the legislature has meant to apply a criminal negligence standard, it has specifically done so. . . . Instead, we find this concept firmly rooted in our jurisprudence: When a crime is punishable as a felony, civil negligence ordinarily is an inappropriate predicate by which to define such criminal conduct. . . . We . . . construe the statute as requiring at least a showing of criminal negligence in the absence of some contrary indication from the legislature that "the public interest in the matter is so compelling or that the potential for harm is so great that the interests of the public must override the interests of the individual" so as to justify civil negligence as a predicate for a felony.

*Santillanes,* 115 N.M. at 222–23, 849 P.2d at 365–66 (quoting *State v. Barber,* 91 N.M. 764, 765, 581 P.2d 27, 28 (Ct.App.1978)) (citations omitted). The State has argued in this case that this language from *Santillanes* is applicable only to the child-abuse statute. However, this case stands for the proposition, well-established in New Mexico, that only criminal negligence may be a predicate for a felony unless another intention is clearly expressed by the legislature.

19. —*Criminal negligence is required to convict of involuntary manslaughter.* Involuntary manslaughter is a fourth-degree felony in New Mexico. As the amici curiae appropriately note, conviction of a fourth-degree felony carries with it a presumptive sentence of eighteen months in the New Mexico State Penitentiary, a fine of up to $5000, a lifetime loss of the right to vote, and the loss of the right to hold an elective office or an appointive public office. *See* NMSA 1978, § 31–18–15(A)(6) & (E)(5) (Repl. Pamp.1994) (eighteen months and $5000); N.M. Const. art. VII, § 1 (Repl.Pamp.1994) (voting); N.M. Const. art. VII, § 2 (Repl. Pamp.1992) (non-qualified electors may not hold elective office); NMSA 1978, § 10–1–2 (Repl.Pamp.1995) (elective or appointive office). In addition to these and other legal consequences of a felony conviction, there are many intangible social repercussions. We must be sure that the penalties associated with a felony conviction are imposed only in response to an act done with at least the minimum culpable state of mind.

The contention than an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. A relation between some mental element and punishment for a harmful act is almost as instinctive as the child's familiar exculpatory "But I didn't mean to," and has afforded the rational basis for a tardy and unfinished substitution of deterrence and reformation in place of retaliation and vengeance as the motivation for public prosecution. Unqualified acceptance of this doctrine by English common law in the Eighteenth Century was indicated by Blackstone's sweeping statement that to constitute any crime there must first be a "vicious will."

*Morissette v. United States,* 342 U.S. 246, 250–51, 72 S.Ct. 240, 243–44, 96 L.Ed. 288 (1952) (quoting 4 William Blackstone, *Commentaries* \*22).

■ 20. As previously noted, criminal negligence has been required in this jurisdiction for involuntary-manslaughter convictions arising out of automobile accidents, and it is required by most of the jurisdictions that still apply the misdemeanor-manslaughter rule. We believe that the law in this area mandates that a felony conviction be based upon more than ordinary negligence. For the reasons stated above, we hold that the State must show at least criminal negligence to convict a criminal defendant of involuntary manslaughter. As set forth in NMRA 14–241 (1996) (criminal jury instruction on vehicular homicide), "to find that the defendant was driving recklessly, [the jury] must find that he drove with willful disregard of the rights or safety of others and in a manner which endangered any person or property."

■ 21. *Careless driving.* The "unlawful act" that served as a predicate for Yarborough's involuntary-manslaughter conviction was the misdemeanor crime of careless driving. *See* § 66–8–114. Careless driving has been a part of the Motor Vehicle Code in New Mexico since its inception. It states:

A. Any person operating a vehicle on the highway shall give his full time and entire attention to the operation of the vehicle.

B. Any person who operates a vehicle in a careless, inattentive or imprudent manner, without due regard for the width, grade, curves, corners, traffic, weather and road conditions and all other attendant circumstances is guilty of a misdemeanor.

Section 66–8–114. Although this is the first time this Court has reviewed this statute, it has been analyzed by the Court of Appeals on other occasions. In *State v. Baldonado,* the Court stated that "the statute prohibits driving while not paying enough attention under the existing circumstances." 92 N.M. 272, 273, 587 P.2d 50, 51 (Ct.App.), *cert. denied,* 92 N.M. 260, 586 P.2d 1089 (1978). In *Baldonado,* the Court of Appeals upheld a conviction of careless driving for carelessly driving through a red light and colliding with another vehicle. This was an act of ordinary or civil negligence and not criminal negligence. *Id.* We agree that the careless-driving statute requires only a showing of ordinary or civil negligence. Therefore, careless driving cannot be used as a predicate for an involuntary-manslaughter convic-

tion. The Court of Appeals is affirmed on this issue.

22. *Barela and Yazzie.* State v. Barela questioned whether a defendant charged with a vehicular killing while driving recklessly or "under the influence" would be entitled to a jury instruction on a lesser-included offense of vehicular killing while committing the misdemeanor of driving carelessly. 95 N.M. 349, 350, 622 P.2d 254, 255 (Ct.App. 1980), *writ quashed,* 95 N.M. 426, 622 P.2d 1046 (1981). There was no suggestion, as there was in this case, that the defendant may have been convicted of the fourth-degree felony of involuntary manslaughter under Section 30–2–3(B). Judge Andrews, in the lead opinion, noted that the Motor Vehicle Code has penalty provisions both for misdemeanor and felony "degrees," and that homicide by vehicle is defined as "the killing of a human being in the unlawful operation of a motor vehicle." She concluded, therefore, that unlawful operation by careless driving resulting in a fatality must be a lesser-included misdemeanor of the third-degree felony for vehicular homicide while driving recklessly. *Barela,* 95 N.M. at 351–52, 622 P.2d at 256–57. Judge Sutin, concurring, stated specially that, "[w]hen the evidence presented to a jury creates a reasonable doubt as to the 'conscious wrongdoing' of a driver, the jury should have the right to reduce the degree of the offense to an unlawful traffic violation." *Id.* at 354, 622 P.2d at 259. Chief Judge Wood dissented, asserting that "[i]t would be absurd to hold the Legislature intended that a killing by careless driving would be treated as a misdemeanor.... To avoid an absurd result, I would hold that the Legislature had no intent that there be lesser included offenses included within the offense of homicide by vehicle." *Id.* at 355–56, 622 P.2d at 260–61.[3]

23. In 1993, in *State v. Yazzie,* the Court of Appeals questioned the precedential value of *Barela,* apparently because Chief Judge Wood had dissented. 116 N.M. 83, 860 P.2d 213 (Ct.App.1993). In *Yazzie,* the Court held that because four specific circumstances are set out for homicide by vehicle, and careless driving is not one of them, "there is no such crime as homicide by vehicle by careless driving." *Id.* at 85, 860 P.2d at 215. Overruling *Barela* and affirming the conviction of Yazzie, who, like Yarborough but unlike Barela, was charged with a single count of *involuntary manslaughter under Section 30–2–3(B),* the Court stated:

The sorts of circumstances under which homicide by vehicle can be committed involve the commission of serious traffic offenses which tend to endanger the lives of other individuals on the road. Careless driving is not this sort of offense; therefore, it is reasonable for the legislature to have excluded it from the homicide by vehicle statute.

The statutory sentencing scheme which results from this construction also makes logical sense. Since it is a third degree felony, the penalty for homicide by vehicle is three years. *See* § 66–8–101; NMSA 1978, § 31–18–15(A)(3) (Repl.Pamp.1990). As a fourth degree felony, the penalty for involuntary manslaughter is eighteen months. *See* § 30–2–3(B); § 31–18–15(A)(4). It is appropriate for the legislature to have provided for a harsher sentence for those individuals who engage in more purposeful dangerous conduct than those individuals who engage in merely careless conduct.

Since there is no such crime as homicide by vehicle by careless driving, the State properly charged Defendant with involuntary manslaughter. The State was required to prove that the death occurred during the commission of an unlawful act not amounting to a felony. *See* § 30–2–3(B). Under the stipulated facts, Defendant admitted that her husband was killed while he was a passenger in a vehicle

---

**3.** The practical or useful significance of the Sutin–Wood polemic in *Barela* lies in the above-quoted words of Judge Sutin. When there is some view of the evidence to sustain a finding that a lesser offense was the highest degree of crime committed, "the defendant should not be required to have guilt or innocence decided, all or nothing, based on the greater offense. There is a legitimate concern that conviction of the greater offense may result because acquittal is an alternative that is unacceptable to the jury." *State v. Meadors,* 121 N.M. 38, 52, 908 P.2d 731, 745 (1995) (Ransom, J., specially concurring).

Defendant drove in a manner consistent with the misdemeanor offense of careless driving. *See* § 66–8–114. Therefore, the evidence supports Defendant's conviction for involuntary manslaughter.

*Yazzie,* 116 N.M. at 85, 860 P.2d at 215.

24. The State has argued that this language from *Yazzie* is inconsistent with the holding made by the Court of Appeals in the immediate case. Both parties, in fact, have asked this Court to review *Yazzie* to determine if it is inconsistent with the Court of Appeals decision in *Yarborough.* In this case, the Court of Appeals took great pains to explain that the holdings of the two cases were not inconsistent. The Court stated:

> We reject the State's contention that *Yazzie* stands for the proposition that careless driving can be the basis for an involuntary manslaughter conviction. In *Yazzie,* the issue was whether the defendant could be convicted of homicide by vehicle, based upon the misdemeanor of careless driving. We determined that the homicide by vehicle statute set out only four specific circumstances under which an individual can be convicted and careless driving is not one of them. Accordingly, we held that "there is no such crime as homicide by vehicle by careless driving." The alternative charge in *Yazzie* was involuntary manslaughter by careless driving, a felony, which Yazzie did not challenge, and which we therefore upheld. Yazzie did not argue, as [Yarborough] does here, that involuntary manslaughter cannot be based on careless driving and that the homicide by vehicle statute preempted the field. Therefore, we never addressed the issue of whether a defendant can be convicted of involuntary manslaughter by careless driving. For this reason, *Yazzie* should be narrowly construed to the precise question decided therein.

*Yarborough,* 120 N.M. at 674–75, 905 P.2d at 214–15 (quoting *Yazzie,* 116 N.M. at 85, 860 P.2d at 215) (citations omitted).

25. We cannot agree with the *Yarborough* Court's reading of *Yazzie.* It is true that the defendant in *Yazzie* primarily argued that homicide by vehicle could not be based on careless driving. The Court in *Yazzie* went beyond this issue, however, to address the merit of the involuntary-manslaughter conviction. The Court explicitly stated that the conviction of Yazzie for involuntary manslaughter by careless driving was correct. *Yazzie,* 116 N.M. at 85, 860 P.2d at 215. It is impossible to construe the language of *Yazzie* narrowly enough to make it consistent with the holding in *Yarborough.* Since we have determined that there is no such crime as involuntary manslaughter by careless driving, those provisions of *Yazzie* that are inconsistent with this opinion are hereby overruled. With respect to *Barela,* we agree with the statement in *Yazzie* that there is no such crime in the Motor Vehicle Code as "homicide by vehicle by careless driving." *Id.* We believe, however, that a misdemeanor traffic violation may indeed be the highest degree of crime committed and that a defendant charged with homicide by vehicle may be entitled under the "cognate approach" to an instruction on the lesser-included offence. *See State v. Meadors,* 121 N.M. 38, 42, 908 P.2d 731, 735 (1995) (describing cognate approach to determining whether one offense is a lesser-included offense within another).

■ 26. *Exclusivity of specific homicide by vehicle statute.* Yarborough has argued that he cannot be retried for involuntary manslaughter even if criminal negligence were shown by the State because the general manslaughter statute has been preempted by the more specific homicide by vehicle statute. When both a general and a special statute apply to the same criminal conduct, the "special statute should control to the extent of compelling the state to prosecute under it." *State v. Blevins,* 40 N.M. 367, 369, 60 P.2d 208, 210 (1936).

> It is a fundamental rule that where the general statute, if standing alone, would include the same matter as the special act, and thus conflict with it, the special act will be considered as an exception to the general statute, whether it was passed before or after such general enactment.

*State v. Ibn Omar–Muhammad,* 102 N.M. 274, 277, 694 P.2d 922, 925 (1985) (quoting *State v. Lujan,* 76 N.M. 111, 117, 412 P.2d

405, 408 (1966) (in turn quoting *Blevins,* 40 N.M. at 368, 60 P.2d at 209)).

27.   Other jurisdictions have held that the enactment of a comprehensive motor vehicle code shows a legislative intent to preempt the field.   In *State v. Davidson,* the Supreme Court of Idaho held that with the passage of the motor vehicle code, the legislature "intended to cover the whole field and subject matter of the operation of motor vehicles, including definitions of the several offenses growing out of the improper operation of such vehicles, prescribing penalties for those offenses, and repealing by implication all acts and parts of acts inconsistent therewith."   78 Idaho 553, 557, 309 P.2d 211, 214 (1957). Similarly, the Supreme Court of Oregon held that their "interpretation of the statutes . . . leads . . . to the conclusion that the negligent homicide statute in carving out of the manslaughter statute the crime of homicide resulting from grossly negligent conduct in the operation of a motor vehicle, carved out gross negligence in all of its gradations from the lowest to the highest form of unintentional culpable conduct including willful and wanton conduct."   *State v. Wilcox,* 216 Or. 110, 337 P.2d 797, 803 (1959); *see also Blackwell v. State,* 34 Md.App. 547, 369 A.2d 153, 158 (1977) (holding that by enacting the more specific homicide by vehicle statute, "the legislature intended to preempt the subject matter of *unintended* homicides resulting from the operation of a motor vehicle"); *State v. Collins,* 55 Wash.2d 469, 348 P.2d 214, 215 (1960) (holding that the older, more general manslaughter statute is preempted by the vehicular homicide statute).

28.   In addition to the case law from this jurisdiction and others, the amici curiae direct the Court's attention to the long and convoluted history of the Motor Vehicle Code in New Mexico to support its position that the homicide by vehicle statute was meant to preempt the involuntary manslaughter statute.   The first appearance of a specific statute dealing with vehicular homicide was in 1953.   1953 N.M. Laws, ch. 139, § 53 (codified at NMSA 1941, § 68–2316 (Supp.1953)). This statute used the criminal negligence standard contained in then current caselaw, and closely followed the Uniform Act Regulating Traffic on Highways.   For reasons that are not readily apparent, the legislature repealed this statute in 1957.   1957 N.M. Laws, ch. 239, § 1.   In 1969 the Motor Vehicle Code was again enacted, and it contained the homicide by vehicle statute basically in its present form.   1969 N.M. Laws, ch. 138, § 1 (codified at NMSA 1953, § 64–22–1 (Supp.1969)).   At this time both homicide by vehicle and involuntary manslaughter statutes had the same punishment, and they remained substantially unchanged until 1983. The punishment for homicide by vehicle was increased to a third-degree felony in 1983, and involuntary manslaughter has remained a fourth-degree felony.   The State argued that this difference in punishment between the two statutes evidences a legislative intent to make homicide by vehicle non-exclusive.

29.   We have stated in *Doe v. State ex rel. Governor's Organized Crime Prevention Commission,* 114 N.M. 78, 80, 835 P.2d 76, 78 (1992), that a statute is to be interpreted as the legislature understands it *at the time it was passed.*   When the specific homicide by vehicle statute was passed the penalties for it and involuntary manslaughter were identical. To adopt the State's argument we would have to acknowledge that the legislature passed a useless statute in that the State could then prosecute under either involuntary manslaughter or homicide by vehicle to the same effect.   Amici argue persuasively that, in fact, the new statute would be worse than useless if the State's theory were correct.   Amici ask why any prosecutor would pursue homicide by vehicle, with its attendant *mens rea* requirements, if the involuntary-manslaughter statute could be used to impose the very same term of imprisonment for the simple act of careless driving?   We agree with amici that the history of this statute leads to the conclusion that the legislature intended to preempt involuntary manslaughter when the predicate offense is a misdemeanor contained within the Motor Vehicle Code.

30.   *Conclusion.*   We hold that conviction of involuntary manslaughter under the misdemeanor-manslaughter rule requires a showing of criminal negligence.   Careless driving only requires a showing of ordinary negligence, and is therefore an improper

predicate offense for involuntary manslaughter. Additionally, we hold that the legislature intended to preempt the crime of involuntary manslaughter with the specific crime of homicide by vehicle when the predicate offence is a violation of the Motor Vehicle Code. We therefore affirm the Court of Appeals.

31. **IT IS SO ORDERED.**

FRANCHINI, and McKINNON, JJ., concurs.

BACA, C.J., dissents.

BACA, Chief Justice (dissenting).

1. I respectfully dissent from the majority's conclusion and from its interpretation of the involuntary manslaughter statute, NMSA 1978, § 30-2-3(B) · (Repl.Pamp.1994). The statute provides in relevant part:

Involuntary manslaughter consists of manslaughter committed in the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death in an unlawful manner or without due caution and circumspection.

NMSA 1978, § 30-2-3(B) (Repl.Pamp.1994). The phrase "due caution and circumspection" includes the concept of criminal negligence. *State v. Arias,* 115 N.M. 93, 96, 847 P.2d 327, 330 (Ct.App.1993), *overruled on other grounds by State v. Abeyta,* 120 N.M. 233, 901 P.2d 164 (1995). Criminal negligence is conduct which is reckless, wanton or wilful. *See State v. Gilliam,* 60 N.M. 129, 288 P.2d 675 (1955). Civil negligence, however, is merely failure to exercise reasonable care under the circumstances. *See* SCRA 1986, 13-1601 (Repl.Pamp.1991).

2. In this case, the majority holds that the "due caution and circumspection" provision of the statute is a necessary element of proof in all cases of involuntary manslaughter. Thus, according to the majority, any act, lawful or unlawful, that serves as a factual predicate for involuntary manslaughter requires a showing of criminal negligence. This holding is not warranted by the language of the statute, and I believe the majority invades the province of the legislature by engrafting this element to the "unlawful act" provision of the statute.

3. Involuntary manslaughter in New Mexico can be premised upon unlawful or lawful acts. This Court has recognized three courses of conduct justifying an involuntary manslaughter conviction: (1) the commission of an unlawful act not amounting to a felony; (2) the commission of a lawful act that might produce death, in an unlawful manner; and (3) the commission of a lawful act that might produce death when committed without due caution and circumspection. *State v. Taylor,* 107 N.M. 66, 70, 752 P.2d 781, 785 (1988), *overruled on other grounds by Gallegos v. Citizens Ins. Agency,* 108 N.M. 722, 731, 779 P.2d 99, 108 (1989).

4. The legislature intended for unlawful-act/involuntary manslaughter to require different proof than lawful-act/involuntary manslaughter. Legislative intent is central to the process of statutory interpretation, and intent is gleaned primarily from the language used. *Roberts v. Southwest Community Health Servs.,* 114 N.M. 248, 251, 837 P.2d 442, 445 (1992) (stating that each portion of a statute to be given effect unless a different intent is clearly expressed). In this case, the intent of the legislature can be inferred first from the structure of the statute. "Without due caution and circumspection" is located at the end of the statute and immediately after the "lawful act" portion. A straight-forward reading suggests that "without due caution and circumspection" modifies only "lawful act," not the earlier "unlawful act" section.

5. The legislature also demonstrated its intent by what it did not include in the statute. The legislature chose not to place an explicit criminal negligence element in the "unlawful act" portion of the statute. Instead, it attached a criminal negligence element after "lawful act," suggesting that a conscious decision was made to exclude such language from the earlier "unlawful act" section. *See State ex rel. Clark v. Johnson,* 120 N.M. 562, 576 n. 6, 904 P.2d 11, 25 n. 6 (1995) (referencing use of the statutory interpretation doctrine of "expressio unius est exclusio alterius"); *see also* 2A Norman J. Singer, *Sutherland Statutory Construction* § 47.23 (5th ed. 1992) (asserting that where the stat-

utory manner of operation is designated, there is an inference that all omissions should be understood as exclusions).

6. This interpretation is strengthened by analyzing the effect of the majority opinion. Their holding requires a showing of criminal negligence for both unlawful-act and lawful-act involuntary manslaughter. If a criminal negligence showing were intended for both unlawful and lawful acts, the legislature would not have needed to make any distinction between unlawful and lawful acts in its chosen language. Thus, the statute demonstrates the legislature's intent to distinguish between unlawful and lawful acts, and this Court must effectuate the intent of the legislature by using the plain language of the statute. *State v. Ogden,* 118 N.M. 234, 242, 880 P.2d 845, 853, *cert. denied,* 513 U.S. 936, 115 S.Ct. 336, 130 L.Ed.2d 294 (1994).

7. Furthermore, the chosen statutory language suggests an intended policy distinction between involuntary manslaughter based on unlawful versus lawful acts. The commission of an unlawful act involves culpable behavior. When manslaughter results from an unlawful act, a link exists between the defendant's culpable conduct and the resulting death. Hence, an element of culpability is already present, and the statutory language indicates that no additional showing of criminal negligence is necessary. Conversely, where a lawful act results in manslaughter, no culpable behavior is involved in the underlying act, and the statutory language calls for proof that the defendant acted without due caution and circumspection.

8. This structure recognizes the greater culpability of the defendant who acts unlawfully as opposed to the person who acts lawfully but whose actions result in unintended death. The majority's holding would treat those who act in an unlawful fashion the same as those acting in accordance with the law, nullifying the distinction between more culpable unlawful acts and less culpable lawful acts. *See Roberts,* 114 N.M. at 251, 837 P.2d at 445.

9. It is within the power of the legislature to make civil negligence the basis for an involuntary manslaughter conviction. This Court stated in *Santillanes v. State,* 115 N.M. 215, 218, 849 P.2d 358, 361 (1993), that:

[i]t is well settled that the legislature has the authority to make negligent conduct a crime.

This Court also recognized that the legislature not only has the authority to make such a decision, but also, it is the appropriate body to do so:

[t]he legislature is the proper branch of government to determine what behavior should be proscribed under its police power and thus to define criminal behavior and provide for its punishment.

*Id.* By imposing a statutory interpretation that eviscerates the plain meaning of the involuntary manslaughter statute, the majority has acted in a capacity which should be reserved for the legislature. Thus, I find that the statute, as written, does not require a showing of criminal negligence for conviction of involuntary manslaughter premised upon an unlawful act.

10. The majority supports their opinion by reliance on New Mexico case law predating *State v. Yazzie,* 116 N.M. 83, 860 P.2d 213 (Ct.App.1993), the case of *Santillanes v. State,* 115 N.M. 215, 849 P.2d 358 (1993), and rationales adopted by other jurisdictions. Such reliance is inappropriate in this instance as the statutory language provides guidance as to the intended effect of the manslaughter statute in New Mexico. As noted by the majority opinion:

[a] statute must be read and given effect as it was written by the legislature, not as the court may think it should be or would have been written if the legislature had envisaged all the problems and complications which might arise in the course of its administration.... Courts must take the act as they find it and construe it according to the plain meaning of the language employed.

*State ex rel. Helman v. Gallegos,* 117 N.M. 346, 352, 871 P.2d 1352, 1358 (1994) (quoting *Perea v. Baca,* 94 N.M. 624, 627, 614 P.2d 541, 544 (1980) (in turn quoting *Burch v. Foy,* 62 N.M. 219, 223, 308 P.2d 199, 202 (1957))). For this reason, the language of the statute should control the interpretation of the law in

this instance and the competing rationales of *Yazzie* and its predecessors are inapposite.

11. The majority also contends that *Santillanes* supports its conclusion. *Santillanes,* 115 N.M. at 215, 849 P.2d at 358. Although this Court in *Santillanes* found that civil negligence is ordinarily an inappropriate predicate by which to define felonious criminal conduct. *Santillanes* was limited to consideration of a child abuse statute. *Id.* at 225 n. 7, 849 P.2d at 368 n. 7. While the rationale of the case might appear applicable in this instance, this Court did not extend its rationale beyond the child abuse statute at issue in that case. *Id.* Thus, the majority's use of *Santillanes* to support its position extends the holding in that case beyond its intended scope.

12. Finally, the majority relies heavily on public policy rationales from other jurisdictions. In this instance, such rationales are not controlling. Instead, as noted earlier, the statutory language here provides a clear manifestation of the intended application of the statute. While shapers of policy may suggest that the majority opinion is more desirable, it is not the function of this Court to second-guess the legislature or to impose what it may deem the more favorable result where the legislature has clearly expressed its intention. Although the judiciary and legislature may differ on the proper form or substance of culpability for an offense, the form and substance remain solely within the province of the legislature to define. *See State v. Powell,* 115 N.M. 188, 848 P.2d 1115 (Ct.App.1993). For these reasons, I respectfully DISSENT.