The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: March 16, 2026

**NO. S-1-SC-40503**

**STATE OF NEW MEXICO,**

　　　　Plaintiff-Appellee,

v.

**MARC WARD,**

　　　　Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**David A. Murphy, District Judge**

Bennett J. Baur, Chief Public Defender
Kimberly Chavez Cook, Appellate Defender
Joelle N. Gonzales, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Raúl Torrez, Attorney General
Walter M. Hart, III, Assistant Attorney General
Santa Fe, NM

for Appellee

**OPINION**

**BACON, Justice.**

{1}     A jury convicted Defendant Marc Ward of willful and deliberate first-degree murder for causing the death of Daniel Bourne (Victim), a church security guard, by striking him with a Ford F-150 pickup truck in the parking lot where Victim was working. There was no question Defendant struck Victim with the pickup truck and drove away without reporting the incident or rendering aid; the only question at trial was Defendant's state of mind when he did so.

{2}     Defendant testified in his own defense, asserting he struck Victim accidentally and only in response to Victim's actions of startling him with a flashlight and firing a gun toward Defendant's truck. Defendant claimed that when he saw Victim's gun, he instinctively covered his eyes and drove out of the parking lot. He further claimed he did not realize he had hit Victim on the way out.

{3}     The State presented evidence indicating Defendant circled back after striking Victim and ran him over a second time: the presence of two distinct fluid trails supported this theory, as well as audio from the incident—recorded on Victim's cell phone—on which two distinct impacts can be heard. The State presented further evidence that after hitting Victim, Defendant got out of the truck and dragged

Victim's body off the church property: Victim's body was found at the bank of a nearby arroyo, and Defendant's jeans had Victim's blood on them.

{4}    On appeal, Defendant raises three issues. Defendant challenges the sufficiency of the evidence for his first-degree willful and deliberate murder conviction; the district court's denial of his requested jury instruction on involuntary manslaughter; and the admission of evidence of a specific incident of Victim's character for peacefulness to rebut Defendant's characterization of Victim as the first aggressor. As to the first issue, we hold the State presented sufficient evidence of deliberation to support Defendant's first-degree murder conviction.

{5}    We also hold the district court properly denied Defendant's requested instruction on involuntary manslaughter. Defendant testified that he acted reflexively when he accidentally struck Victim, which does not satisfy the mens rea requirement of involuntary manslaughter. *State v. Yarborough*, 1996-NMSC-068, ¶¶ 12-19, 122 N.M. 596, 930 P.2d 131. In this opinion, we clarify that the requisite mens rea for involuntary manslaughter is *recklessness*, overruling our previous use of the term *criminal negligence*, and we accordingly direct the Uniform Jury Instructions-Criminal Committee (UJI-Criminal Committee) to draft new instructions reflecting the correct mens rea standard.

{6} Finally, we hold the district court did not abuse its discretion in admitting evidence of a specific incident demonstrating Victim's character for peacefulness because, in the absence of case law construing the relevant rules, it was reasonable but erroneous for the district court to determine that Victim's "character or character trait" for peacefulness was "an essential element of a charge, claim, or defense," which the State could then prove "by relevant specific instances of conduct." Rule 11-405 NMRA. Even though the district court erred, there is no reasonable probability the admission of this testimony affected the verdict. As such, the error was harmless.

{7} Finding no merit in Defendant's contentions, we affirm his conviction for first-degree willful and deliberate murder.

**I.      BACKGROUND**

**A.      Defendant's Testimony**

{8} Defendant testified that on the night of September 23, 2022, he was sitting in his truck in the parking lot of Calvary Church, watching a movie on his iPad, when he was startled by a flashlight in his mirror. He did not see who had shined the light in his mirror, and he did not have his glasses on at the time. He pulled his truck around in a U-turn to look for the person who had "snuck up on" him with the flashlight. When he parked, he noticed a man wearing a dark shirt in his blind spot.

He looked down to find his glasses, which caused him to lose track of the man, and he began driving toward the exit. As he was leaving, he noticed the man reappear on his left. He saw the man draw a gun from his pocket. Defendant testified:

> I got panicked. I never had anyone draw a weapon on me. So I panicked. I see him raise the gun, I close my eyes, put my arm up—I know this is not gonna stop a bullet, but it was just instinct. I heard a gunshot.

> I didn't instantly feel any pain, like I still had my eyes closed, I didn't feel any pain. So I kinda open my eyes. I see that I overshot the turn. I slam on the brakes as I'm trying to hit the turn. Pop the curb.

> Uh, I was a bit dazed for a minute. I don't know how long I was on the curb, but what I remember next is getting off there, and getting out of there, feeling to see if I felt any blood. I didn't feel any pain or anything, but maybe I just hadn't felt it yet. I was checking myself to see if there was blood. And I remember getting out of the parking lot, thinking I might get shot at again.

Defendant emphasized he could not see anything when he heard the gunshot because his eyes were closed, and the only thing on his mind was whether he had been shot. He described his mental state as "freaked out," "completely bewildered," and "panicking."

{9} After leaving the parking lot, Defendant testified that he drove to a nearby business to check whether his truck had been damaged by the bullet, but he did not see any damage. He drove to another parking lot and contemplated whether he should go to the emergency room because his heart was still racing from the incident. Instead, he decided to go into downtown Albuquerque as he had originally planned

so he could "maybe have some sort of normalcy in the evening, . . . calm down, and . . . process," and he stayed downtown until approximately midnight, after which he returned home.

{10}	Defendant denied ever touching or moving Victim's body, taking any of his property, or having any intention to run over Victim.

**B.	The State's Evidence**

{11}	The State introduced evidence that Victim approached Defendant's truck to serve him a trespass notice. Victim sent a text message to his security team at 9:16 p.m. with a photograph of the back of Defendant's truck and license plate, stating "Checking veh west 16." Two minutes later, Victim sent another text message stating "Pulled away and stopped," with another photograph of Defendant's truck. The second photograph shows the side of Defendant's truck, with eight parking spaces between the truck and the position of the camera.

{12}	At 9:19 p.m., Victim began recording a video on his cell phone, but the camera was covered for most of the interaction. The first minute of that ten-minute audio captured an engine revving up, followed by two gunshots plus an impact with screeching tires in quick succession and two more impacts; Victim's agonal breathing persisted through the remaining audio. The State argued that the first impact was caused by the truck hitting Victim, the second by Defendant hitting the

curb, and the third—thirty seconds later—by Defendant hitting Victim a second time with his truck.

{13}    The State introduced evidence that Defendant's radiator was pierced by Victim's bullet and began leaking fluid. Two distinct fluid trails are visible in crime scene photographs. These fluid trails appear separately from tire acceleration marks, which indicated, according to the State's expert, that the truck "would have come back two more times after the acceleration marks were created," for "a total of three passes."

{14}    The medical examiner testified for the State that Victim died of blunt trauma consistent with being struck by a vehicle, and it was possible Victim was struck more than once. The forensic pathologist who testified for Defendant reached the same conclusions, agreeing it was possible Victim was struck more than once. Both experts agreed the marks on Victim's body indicated he was dragged, prone, away from the scene of impact. The medical examiner testified that it was possible Victim was still alive at the time he was dragged: it would have taken Victim "multiple minutes" to die of his injuries, and if he had received prompt medical treatment, she opined that he possibly could have survived.

{15}    The State also introduced evidence that Defendant stopped his truck for some period of time near where Victim was bleeding; photographs and testimony

6

demonstrated there was a puddle of fluid near a pool of Victim's blood, indicating the truck was stationary at that location while it continued to leak fluid. A trail of blood led from the parking lot down a concrete walkway and to the bank of the arroyo where Victim's body was found. Victim's gun and other belongings were taken from his person. Victim's wallet, however, appeared to be intact—it contained his driver's license, various credit and other cards, and over ninety dollars in cash. A bloodstain on the right front pocket of Defendant's blue jeans and another bloodstain on the front left leg of Defendant's blue jeans contained Victim's DNA. Defendant testified he was a bodybuilder who weighed 230 pounds and could bench press 440 pounds at the time of the incident.

{16}     Over defense objection, the district court also allowed the jury to hear testimony from one of Victim's colleagues about a previous instance of Victim peacefully de-escalating a conflict in the course of his duties dealing with trespassers on church property.

**C.     The Conviction and Sentence**

{17}     The jury was instructed on first-degree willful and deliberate murder, second-degree murder, voluntary manslaughter, and self-defense. The jury returned a verdict of guilty of first-degree willful and deliberate murder. The district court sentenced Defendant to life in prison. Defendant filed his direct appeal in this Court.

## II.   DISCUSSION

## A.   Sufficient Evidence Supports Defendant's Conviction for Willful and Deliberate Murder

{18}   Defendant challenges the sufficiency of the evidence for the jury's finding that he killed Victim willfully and deliberately. We review claims of insufficient evidence with deference to the jury's verdict, "view[ing] the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Revels*, 2025-NMSC-021, ¶ 57, 572 P.3d 974 (quoting *State v. Montoya*, 2015-NMSC-010, ¶ 52, 345 P.3d 1056 (internal quotation marks omitted)). "Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject Defendant's version of the facts." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. This Court "does not evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence." *State v. Garcia*, 1992-NMSC-048, ¶ 25, 114 N.M. 269, 837 P.2d 862 (internal quotation marks and citation omitted). Instead, we ask, "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt *beyond a reasonable doubt* with respect to *every element* essential to a conviction." *Id.* (internal quotation marks and citation omitted). "Deliberate intent may be inferred from the particular circumstances of the killing as proved by the State

8

through the presentation of physical evidence." *State v. Duran*, 2006-NMSC-035, ¶ 8, 140 N.M. 94, 140 P.3d 515. "So long as a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction, we will not upset a jury's conclusions." *State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057 (text only) (citation omitted).[1]

{19} Defendant argues that the "circumstantial evidence from oil trails is too speculative to establish a second attack, as it was not proven when those oil trails occurred, and if caused by [Defendant's] truck, they are also consistent with [Defendant's] description of a desperate flight from an active shooter." Defendant also argues the lack of "crush injuries" render the State's second attack theory "pure speculation." He further argues that any actions he may have taken after striking Victim are "irrelevant to intent" and therefore that the jury "improperly relied on post-collision conduct to find deliberate intent." Notably, Defendant does not address the contemporaneous audio of the incident that recorded the sound of multiple impacts.

{20} "Intent is subjective and is almost always inferred from other facts in the case, as it is rarely established by direct evidence." *State v. Sosa*, 2000-NMSC-036, ¶ 9,

---

[1]"(Text only)" indicates the omission of nonessential punctuation marks—including internal quotation marks, ellipses, and brackets—that are present in the text of the quoted source, leaving the quoted text otherwise unchanged.

129 N.M. 767, 14 P.3d 32 (internal quotation marks and citation omitted); *see also* UJI 14-201 NMRA ("A deliberate intention may be inferred from all of the facts and circumstances of the killing."). The presence of two distinct fluid trails separate from the tire acceleration marks permits a rational inference that Defendant circled back, after his truck's radiator was damaged by Victim's bullet, as the State's expert testified, to strike Victim a second time. Additionally, the jury listened to the audio from the incident, which recorded two distinct impacts, thirty seconds apart. Medical testimony could neither confirm nor rule out a second strike.

{21}     From this circumstantial evidence, the jury could have reasonably concluded that after striking Victim the first time, Defendant purposefully circled around in his truck for the purpose of killing an already-incapacitated Victim. This evidence of a second, purposeful strike is sufficient to support the jury's finding that Defendant killed Victim with deliberate intent. *See, e.g.*, *Sosa*, 2000-NMSC-036, ¶ 14 (concluding there was sufficient evidence of deliberate intent where the defendant shot the victim on his porch, then "pursu[ed] the wounded and defenseless victim into the street and [shot] him from behind"); *State v. Cunningham*, 2000-NMSC-009, ¶¶ 25, 28, 128 N.M. 711, 998 P.2d 176 (concluding there was sufficient evidence of deliberate intent where the defendant returned to the "incapacitated and defenseless" victim and fired a fatal shot from a second gun). "Just because the

10

evidence supporting the conviction was circumstantial does not mean it was not substantial evidence." *Montoya*, 2015-NMSC-010, ¶ 53 (internal quotation marks and citation omitted).

{22}     The State presented additional evidence that after striking Victim, Defendant stopped his truck near Victim's body and dragged him to an arroyo. The presence of a puddle of fluid near a pool of Victim's blood supports this inference, as does the presence of Victim's blood on Defendant's jeans. Defendant then left the scene without reporting the incident or rendering aid. The medical examiner and the forensic pathologist testified that Victim may have been alive at the time, and Victim's life may have been saved had he received timely medical treatment. Victim's agonal breathing can be heard for the duration of the video he recorded on his cell phone, which was a total of ten minutes long. Even though the foregoing is evidence of Defendant's specific behavior after he struck the fatal blow, it is not irrelevant to intent as Defendant claims.

{23}     Evidence of Defendant's behavior after dealing the fatal blow, "while perhaps not establishing deliberation by itself, can show consciousness of guilt which could be considered in tandem with the evidence of deliberation prior to and during the killing." *State v. Chavez*, 2024-NMSC-023, ¶ 48, 562 P.3d 521. While these actions, "standing alone, might have been insufficient to prove Defendant's deliberate

intention, they were probative of deliberation in the context of all of the evidence introduced on that element of first-degree murder." *State v. Astorga*, 2015-NMSC-007, ¶ 65, 343 P.3d 1245 (holding the defendant's statements and flight to Mexico after the homicide were probative of deliberation); *see also, e.g.*, *State v. Flores*, 2010-NMSC-002, ¶ 23, 147 N.M. 542, 226 P.3d 641 ("Not only may [the] [d]efendant's acts before and during the crime provide evidence of intent, evidence of flight or 'an attempt to deceive the police' may prove consciousness of guilt." (citation omitted)), *overruled on other grounds by*, *State v. Martinez*, 2021-NMSC-002, ¶ 87, 478 P.3d 880.

{24} We conclude the State presented sufficient evidence of deliberation to support Defendant's conviction for first-degree willful and deliberate murder.

**B.      Defendant Was Not Entitled to an Involuntary Manslaughter Instruction**

{25} Whether the trial court erroneously denied a defendant's requested jury instruction is a mixed question of law and fact that we review de novo. *State v. Henley*, 2010-NMSC-039, ¶ 12, 148 N.M. 359, 237 P.3d 103. As to the question of law presented here, "An involuntary manslaughter jury instruction is proper only when the evidence presented at trial permits the jury to find the defendant had a mental state of criminal negligence." *Id.* ¶ 3. As to "a defendant's requested instructions," this Court "view[s] the evidence in the light most favorable to the

12

giving of the requested instruction." *State v. Skippings*, 2011-NMSC-021, ¶ 10, 150 N.M. 216, 258 P.3d 1008 (internal quotation marks and citation omitted). "[A] defendant is entitled to an instruction on a lesser-included offense when there is evidence tending to establish the lesser offense." *Id.* ¶ 8 (text only) (citation omitted).

{26} Involuntary manslaughter—the lowest degree of criminal homicide—is defined as, "the unlawful killing of a human being without malice . . . in the commission of an unlawful act not amounting to felony, or in the commission of a lawful act which might produce death in an unlawful manner or without due caution or circumspection." NMSA 1978, § 30-2-3(B) (1994). Other than requiring an absence of malice, the Legislature left the mens rea level for involuntary manslaughter unstated. *See Yarborough*, 1996-NMSC-068, ¶ 11 ("[T]he involuntary-manslaughter statute does not contain any mention of a culpable state of mind or culpable degree of conduct."). Thus, the mens rea for involuntary manslaughter has been set entirely by case law; we have labeled the mens rea "criminal negligence," *id.* ¶ 20, but we have defined that term to require the defendant's subjective awareness of risk, *Henley*, 2010-NMSC-039, ¶¶ 16-17.

{27} We affirm the district court's denial of Defendant's requested involuntary manslaughter instruction because Defendant's testimony indicated he killed Victim purely by accident: that is, Defendant asserted he was unaware his actions put Victim

13

at risk. As we explain below, unless there is evidence indicating that a defendant was subjectively aware of the risk, an involuntary manslaughter instruction should not be given.

**1.  Defendant's testimony that he killed Victim by accident did not warrant an involuntary manslaughter instruction; if believed, his testimony would be a complete defense that would result in acquittal**

{28} It is not a crime in New Mexico to cause a person's death accidentally. The Legislature made this clear in our excusable homicide statute, which provides a homicide "committed by accident or misfortune in doing any lawful act, by lawful means, with usual and ordinary caution and without any unlawful intent," is excusable, i.e., noncriminal. NMSA 1978, § 30-2-5(A) (1963); *see also* NMSA 1978, § 30-2-8 (1963) (requiring a finding of excusable homicide to result in full acquittal). The principle that an accidental death resulting from a car collision does

14

not amount to involuntary manslaughter has been established in our case law since at least the 1930s.[2]

{29} Thus, even though involuntary manslaughter is an unintentional killing, it does require a culpable mental state that is distinguishable from mere accident. An unintentional killing means simply the actor did not intend their action to result in death; nevertheless, the actor could still have a culpable mental state that results in criminal liability. *See* Leo M. Romero, *Unintentional Homicides Caused by Risk-Creating Conduct: Problems in Distinguishing Between Depraved Mind Murder, Second Degree Murder, Involuntary Manslaughter, and Noncriminal Homicide in New Mexico*, 20 N.M. L. Rev. 55, 75 (1990). In contrast, "[i]f a homicide is accidental, the defendant acted *without a criminally culpable state of mind* in performing a lawful act, unintentionally killing the victim." *Henley*, 2010-NMSC-039, ¶ 22 (emphasis added); *see also State v. Lucero*, 2010-NMSC-011, ¶ 13, 147

___

[2]*See, e.g.*, *State v. Harris*, 1937-NMSC-046, ¶ 6, 41 N.M. 426, 70 P.2d 757 ("[I]n the case of an accidental death of a pedestrian struck by an automobile, . . . injury caused by mere negligence . . . cannot be made the basis of a criminal action."); *State v. Sisneros*, 1938-NMSC-049, ¶ 30, 42 N.M. 500, 82 P.2d 274 (holding involuntary manslaughter in the context of a car accident requires "the conduct of the driver of the [vehicle to be] so reckless, wanton, and willful as to show an utter disregard for the safety of pedestrians"); *City of Raton v. Rice*, 1948-NMSC-054, ¶ 6, 52 N.M. 363, 199 P.2d 986 (similar); *State v. Hayes*, 1966-NMSC-260, ¶ 3, 77 N.M 225, 421 P.2d 439 (similar); *Yarborough*, 1996-NMSC-068, ¶ 20 (similar).

N.M. 747, 228 P.3d 1167 ("[A]n accidental killing is *excusable* because it is an unintended homicide which occurs in the course of performing a lawful act, without criminal negligence. As in other cases of excusable homicide, the slayer is not criminally responsible therefor, as an act that is committed accidentally does not involve a mental state cognizable to the criminal offenses of murder and involuntary manslaughter." (internal quotation marks and citations omitted)).

{30} Accordingly, this Court held in *Henley* that a defendant was not entitled to an involuntary manslaughter instruction where the defendant testified that he accidentally fired the gun and killed the victim. 2010-NMSC-039, ¶¶ 3, 7, 26. We explained that even though "both involuntary manslaughter and accident relate to unintentional killings, . . . the mens rea of accident and involuntary manslaughter are *irreconcilably distinct*, and the evidence of one does not support instructing the jury on the other." *Id.* ¶ 19 (emphasis added). "An involuntary manslaughter instruction is proper only where there is evidence of an unintentional killing and a mens rea of criminal negligence; evidence supporting alternative, and incompatible, theories"—such as a theory that the death was caused by accident—"may not be substituted for the act and mental state requirements of the involuntary manslaughter statute." *Id.* ¶ 22.

{31} The district court in this case correctly relied on *Henley* and these underlying principles to determine Defendant was not entitled to an instruction on involuntary manslaughter because his defense was that he accidentally struck Victim with his truck, which would be an excusable and therefore noncriminal act.

{32} On appeal, Defendant continues to argue as he did before the district court that *State v. Gallegos*, 2001-NMCA-021, 130 N.M. 221, 22 P.3d 689, provides authority contrary to *Henley* that should allow him to receive instructions on both involuntary manslaughter and self-defense. However, *Gallegos* is distinguishable. In that case, the issue was not whether the defendant was entitled to an instruction on involuntary manslaughter, but whether a defendant who was charged with involuntary manslaughter could also receive an instruction on self-defense. *Id.* ¶ 16. In this case, in contrast, Defendant received a self-defense instruction, so the question presented in *Gallegos* is not present here. *Gallegos*, therefore, is not controlling; *Henley* is controlling.

{33} Defendant's testimony that he had no idea Victim was there and he ran Victim over accidentally, if believed, would have established that Defendant committed no crime. Therefore, it did not support the giving of an instruction on involuntary

17

manslaughter.[3] *See Lucero*, 2010-NMSC-011, ¶ 14 ("[J]uries are not given an instruction on the defense of accident because, in the absence of criminal negligence, the defendant cannot be found guilty of involuntary manslaughter."); *see also* UJI 14-5140 NMRA, use note 1 (noting no instruction shall be given on the subject of excusable homicide). Because Defendant's testimony did not establish the elements of involuntary manslaughter, the district court correctly refused to instruct the jury on that crime. *See Henley*, 2010-NMSC-039, ¶ 3.

**2.      UJI 14-231 NMRA incorrectly uses language reflecting a civil negligence standard and must be revised to reflect that involuntary manslaughter requires a mens rea of recklessness**

{34}     In *Yarborough*, this Court established the mens rea standard for involuntary manslaughter by carefully distinguishing ordinary civil negligence from criminal negligence. 1996-NMSC-068, ¶¶ 10-20. Ultimately, the *Yarborough* Court concluded "that the law in this area mandates that a felony conviction be based upon

---

[3]As an alternative basis for his claim of entitlement to an involuntary manslaughter instruction, Defendant makes a cursory argument that he "could have been violating the reckless driving statute" when he put his arm over his eyes while driving. However, homicide caused by reckless driving, or any other violation of the Motor Vehicle Code, must be charged as vehicular homicide rather than involuntary manslaughter. *Yarborough*, 1996-NMSC-068, ¶¶ 26-30; *see also* UJI 14-231 NMRA comm. cmt. (noting that, pursuant to *Yarborough*, a "[v]ehicular homicide caused by reckless driving must be charged under the vehicular homicide statute"). Therefore, Defendant was not entitled to an involuntary manslaughter instruction based on reckless driving.

18

more than ordinary negligence," i.e., civil negligence. *Id.* ¶ 20. Instead, "the State must show at least criminal negligence to convict a criminal defendant of involuntary manslaughter." *Id.*

{35} However, even though *Yarborough* explicitly rejected an ordinary, civil negligence standard for involuntary manslaughter, *id.* ¶ 20, the Court did not examine the corresponding uniform jury instruction, UJI 14-231, setting forth the elements of involuntary manslaughter. An involuntary manslaughter conviction under UJI 14-231 requires a jury to find that the defendant "should have known of the danger involved" by the defendant's actions and "acted with a willful disregard for the safety of others." The term *should have known* corresponds to an ordinary, civil negligence standard. *See, e.g.*, *State v. Consaul*, 2014-NMSC-030, ¶ 39, 332 P.3d 850 (discussing the "close association" between a "knew or should have known" standard and "principles of civil negligence and ordinary care"); *State v. Taylor*, 2024-NMSC-011, ¶ 25, 548 P.3d 82; *State v. Mascarenas*, 2000-NMSC-017, ¶ 13, 129 N.M. 230, 4 P.3d 1221; *State v. Suazo*, 2017-NMSC-011, ¶ 23, 390 P.3d 674.

{36} Defendant relies on the ordinary civil negligence language in UJI 14-231 to support his claim of entitlement to an involuntary manslaughter instruction in this case: he argues that he "'should have known' of the danger involved in speedily

19

driving with his eyes closed and his hands not on the wheel," even though he was entirely unaware that Victim was in danger. This argument highlights the disjuncture between the criminal negligence standard announced in *Yarborough* and the "should have known," civil negligence, standard contained in UJI 14-231.

{37} The use of the term "should have known" in UJI 14-231 allows a jury to convict even if the jury believes the defendant was entirely unaware of the risk. As Professor Romero discussed several decades ago, the "should have known" language in this instruction conflicts with the UJI's other requirement of "willful disregard," because "[o]ne does not disregard a risk of which one is unaware." Romero, *supra*, at 75-76. Because UJI 14-231 contains both an objective "should have known" and a subjective "willful disregard" element, a jury might conclude "that either recklessness, based upon subjective realization of the risk, or negligence, based on the objective standard of what the defendant should have known, will satisfy the culpability requirements for involuntary manslaughter." Romero, *supra*, at 76. That conclusion would be erroneous: "[I]nvoluntary manslaughter requires subjective knowledge by the defendant of the danger or risk to others posed by his or her actions." *Henley*, 2010-NMSC-039, ¶ 17.

{38} We conclude the "should have known" language contained in UJI 14-231 misstates the mens rea requirement of involuntary manslaughter and could mislead

20

a jury. The use of "should have known" is inconsistent with *Yarborough*'s holding that involuntary manslaughter requires more than ordinary negligence and *Henley*'s holding that involuntary manslaughter requires subjective knowledge of the risk. Accordingly, we direct the UJI-Criminal Committee to recommend changes to UJI 14-231 to omit the "should have known" language. Although the parties did not brief this issue, this Court can correct a problem with its own UJIs sua sponte. *See, e.g.*, *Consaul*, 2014-NMSC-030, ¶ 27 ("[W]e discuss whether the language currently used in our uniform jury instructions adequately captures the true nature of the crime and the legislative intent behind the statute. We raise this issue sua sponte as a matter of public importance."); *State v. Lewis*, 2019-NMSC-001, ¶ 21, 433 P.3d 276 (raising sua sponte the issue of how the trial court must instruct the jury on lesser included offenses).

{39}     We take note of a second disjuncture between the terminology used to describe the mens rea of involuntary manslaughter—the "criminal negligence" terminology first adopted in *Yarborough*—and the substantive requirement that a defendant have subjective knowledge of the risk. *See, e.g.*, *Henley*, 2010-NMSC-039, ¶ 16 ("To be convicted of involuntary manslaughter, a defendant *must have been aware of the risk* caused by his or her conduct and continued to act." (emphasis added)). Generally, to distinguish between ordinary civil negligence and the

heightened mens rea (either criminal negligence or recklessness) that gives rise to criminal liability, the criminal law looks to "either one or both of two things: (1) Perhaps the defendant's conduct must involve a *greater risk of harm* to others than tort negligence requires," or "(2) Perhaps . . . the criminal law might require that the defendant *consciously realize*, in his own mind, the risk he is creating." 1 Wayne R. LaFave, *Substantive Criminal Law*, § 5.4 at 492 (3d ed. 2018) (emphasis added). When the criminal law requires both a heightened magnitude of risk and subjective awareness of the risk, the term *recklessness* is generally used. *Id.*

{40}    We conclude the term *criminal negligence* is not an accurate reflection of the mens rea required for involuntary manslaughter. *Yarborough* adopted the term when the legal landscape was quite different: it relied in part on the Court's interpretation of the minimum mens rea for child abuse adopted in *Santillanes v. State*, 1993-NMSC-012, ¶ 31, 115 N.M. 215, 849 P.2d 358, *modified by*, *Consaul*, 2014-NMSC-030, ¶ 38. *Yarborough*, 1996-NMSC-068, ¶ 18. Because *Santillanes* had determined the civil negligence standard could not be used to support a child abuse conviction, *Yarborough* reasoned that criminal negligence was the minimum mens rea that may be punished by the criminal law. 1996-NMSC-068, ¶ 18 (holding *Santillanes* "stands for the proposition, well-established in New Mexico, that only criminal negligence

22

may be a predicate for a felony unless another intention is clearly expressed by the [L]egislature").

{41} Since then, that proposition has been eclipsed by this Court's holding in *Consaul* that "what has long been called 'criminally negligent child abuse' should hereafter be labeled 'reckless child abuse' without any reference to negligence." 2014-NMSC-030, ¶ 37. We adopted the term *recklessness* in *Consaul* because the criminal negligence standard proved to be unworkable, as its definition was hopelessly confusing to jurors. *Id.* ¶¶ 28-37. In *Consaul*, we rejected the terminology of criminal negligence entirely, instead concluding that even though the child abuse statute used the term *negligence*, "The Legislature intended to punish acts done with a reckless state of mind." *Id.* ¶ 36.

{42} Additionally, *Yarborough* adopted the term *criminal negligence* without analyzing whether recklessness would be a more appropriate standard. Even though *Yarborough* relied on precedent in cases that employ a recklessness standard, using terms such as "'reckless, willful and wanton disregard of consequences,'" 1996-NMSC-068, ¶ 12 (quoting *State v. Harris*, 1937-NMSC-046, ¶ 6, 41 N.M. 426, 70 P.2d 757), "'conscious abandonment of any consideration for . . . safety,'" *id.* ¶ 13 (quoting *State v. Hayes*, 1966-NMSC-260, ¶ 3, 77 N.M. 225, 421 P.2d 439), and "'wanton and reckless'" action, *id.* (quoting *State v. Clarkson*, 1954-NMSC-007, ¶

23

11, 58 N.M. 56, 265 P.2d 670), *Yarborough* used the term *criminal negligence* to comport with the now-overruled terminology from *Santillanes*.

{43} However, in substance, the standard for involuntary manslaughter has always been one of recklessness. "Our case law has long integrated the requirement of subjective knowledge into the showing of criminal negligence required by our involuntary manslaughter statute." *Henley*, 2010-NMSC-039, ¶ 17. This requirement of subjective knowledge raises the mens rea of involuntary manslaughter from criminal negligence to recklessness. *See, e.g.*, *1 Model Penal Code* § 2.02(2)(c)-(d) (A.L.I. 1985) (stating criminal negligence involves a risk of which the defendant "should be aware," whereas recklessness involves "conscious[] disregard" of "a substantial and unjustifiable risk"); *see also* LaFave, *supra*, § 5.4 at 492 (noting recklessness requires the defendant to "consciously realize, in his own mind, the risk he is creating"); *Consaul*, 2014-NMSC-030, ¶ 37 (adopting the *Model Penal Code* definition of *recklessly*).

{44} We also conclude that recklessness is the appropriate standard for involuntary manslaughter because the Legislature did not define a mens rea level for involuntary manslaughter but instead left the mens rea unstated. *See, e.g.*, *State v. Schoonmaker*, 2008-NMSC-010, ¶ 44, 143 N.M. 373, 176 P.3d 1105 (noting "a recklessness standard may be more appropriate" for involuntary manslaughter than child abuse

because "there is no indication of legislative intent to require a lower *mens rea* standard" for involuntary manslaughter), *overruled on other grounds by*, *Consaul*, 2014-NMSC-030, ¶ 38; *see also 1 Model Penal Code* § 2.02(3) (A.L.I. 1985) (setting recklessness as the minimum mens rea for criminal liability when a statute is silent on mens rea).

{45} We therefore hold the mens rea of involuntary manslaughter is recklessness. In line with the standard definition of recklessness, "involuntary manslaughter *requires subjective knowledge* by the defendant of the danger or risk to others posed by his or her actions." *Henley*, 2010-NMSC-039, ¶ 17 (emphasis added). As we did in *Consaul*, we conclude that "[t]he jury should be instructed with this terminology alone," 2014-NMSC-030, ¶ 37, and we hereby overrule prior cases that use the term *criminal negligence* to describe the mens rea of involuntary manslaughter, *id.* ¶ 38. We direct the UJI-Criminal Committee to draft uniform jury instructions consistent with this holding.

**C.    Any Error in the Admission of Evidence of Victim's Character for Peacefulness Was Harmless**

{46} A trial court's evidentiary rulings are reviewed on appeal for abuse of discretion. *State v. Armendariz*, 2006-NMSC-036, ¶ 6, 140 N.M. 182, 141 P.3d 526, *overruled on other grounds by*, *State v. Swick*, 2012-NMSC-018, ¶ 19, 279 P.3d 747. "An abuse of discretion arises when the evidentiary ruling is clearly contrary to logic

25

and the facts and circumstances of the case." *Id.* "We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *Flores*, 2010-NMSC-002, ¶ 25 (internal quotation marks and citation omitted). Even if a trial court erred in admitting evidence, we review the error for nonconstitutional harmless error. *State v. Serna*, 2013-NMSC-033, ¶ 22, 305 P.3d 936. "'[N]on-constitutional error is harmless when there is no reasonable *probability* the error affected the verdict.'" *Id.* (alteration in original) (quoting *State v. Tollardo*, 2012-NMSC-008, ¶ 36, 275 P.3d 110).

{47} At trial, the district court permitted the State to introduce evidence that on one prior occasion while working as a security guard, Victim had been physically threatened on church property and did not pull out his weapon. At issue is Defendant's contention that "[t]he State should not have been allowed to rebut first aggressor evidence with a specific incident of peacefulness" because such evidence should only be allowed "if [D]efendant opens the door."

{48} As a general rule, "[e]vidence of person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Rule 11-404(A)(1) NMRA. However, Rule 11-404(A)(2)(c) provides that "in a homicide case, the prosecutor may offer evidence of the victim's trait of peacefulness to rebut evidence that the victim was the first aggressor."

26

Additionally, Rule 11-405(B) provides, "When a person's character or character trait is an essential element of a charge, claim, or defense, the character or trait may also be proved by relevant specific instances of conduct."

{49}     Thus, the correctness of the district court's ruling hinges on whether Victim's character for peacefulness was "an essential element of a charge, claim, or defense" in this case. *Id.* If it was, then the evidence was properly admitted. If not, then the admission was error. For the reasons given below, we conclude that the district court erred but that error did not rise to the level of abuse of discretion. Additionally, any error in the admission of this testimony was harmless under the totality of the circumstances.

**1.     The district court erred when it determined Victim's character for peacefulness was an essential element of a charge, claim, or defense, but the error was harmless**

{50}     Defendant concedes that his "self-defense claim made first aggressor status an element of his defense." But he argues the claim "did not make [Victim's] *character* an element of the offense" because he "did not assert or present evidence that [Victim] had an aggressive nature or a reputation for starting conflicts." The State found no New Mexico authority "addressing the issue whether the prosecution may offer evidence of specific instances of a deceased victim's character trait of peacefulness in a homicide case involving a claim of self-defense to address the issue

27

of who was the first aggressor," and Defendant also asserts this is an issue of first impression in New Mexico.

**{51}** We agree with the parties that no New Mexico case has directly addressed the method by which the prosecution may introduce evidence of the deceased victim's character for peacefulness under Rule 11-404(A)(2)(c). However, we have analogous case law arising in the context of a defendant seeking to admit specific acts evidence to prove the victim's *violent* character made it more likely that the victim was the first aggressor. *See, e.g.*, *Armendariz*, 2006-NMSC-036, ¶ 6-10; *State v. Baca*, 1992-NMSC-055, ¶¶ 2, 11, 114 N.M. 668, 845 P.2d 762; *State v. McCarter*, 1980-NMSC-003, ¶¶ 12-17, 93 N.M. 708, 604 P.2d 1242; *State v. Gallegos*, 1986-NMCA-004, ¶¶ 29-31, 104 N.M. 247, 719 P.2d 1268; *State v. Montoya*, 1981-NMCA-021, ¶ 9, 95 N.M. 433, 622 P.2d 1053; *State v. Bazan*, 1977-NMCA-011, ¶ 21, 90 N.M. 209, 561 P.2d 482. Although those cases arose in an inverse posture (addressing each victim's character for violence), they are relevant to the determinative issue here, which is whether a victim's character for peacefulness can be considered "an essential element of a charge, claim, or defense" when the defendant claims the victim was the first aggressor under Rule 11-404(A)(2)(c) and Rule 11-405(B).

{52} As a whole, those cases have been inconsistent in their analyses and conclusions. *Compare, e.g., Baca*, 1992-NMSC-055, ¶ 6 (holding "specific instances of the victim's conduct may be admitted when the defendant claims self-defense and when those instances would reflect on . . . who was the first aggressor"), *and Gallegos*, 1986-NMCA-004, ¶ 32 ("In issues of self-defense, the victim's character constitutes an element of the defense which properly can be proven by specific instances of conduct."), *with Armendariz*, 2006-NMSC-036, ¶ 17 (holding the opposite).

{53} However, in our most recent precedent, *Armendariz*, we held that "specific instances of a victim's prior violent conduct may not be admitted to show that the victim was the first aggressor when the defendant is claiming self-defense" because "a victim's violent character is not an essential element of a defendant's claim of self-defense." 2006-NMSC-036, ¶ 17. Instead, a victim's violent character provides "circumstantial evidence that tends to show that the victim acted in conformity with his or her character on a particular occasion. Thus, under Rule 11-405(B) NMRA, only reputation or opinion evidence should be admitted to show that the victim was the first aggressor," *Armendariz*, 2006-NMSC-036, ¶ 17, when character is an essential element of the claim of self-defense.

{54} If "a victim's violent character is not an essential element of a defendant's claim of self-defense," *id.*, then it stands to reason that a victim's peaceful character likewise should not be an essential element of disproving that defense. Just like a victim's violent character does not directly prove the victim was the first aggressor, a victim's peaceful character only provides "circumstantial evidence that tends to show that the victim acted in conformity" with that peaceful character. *Id.* Thus, we hold *Armendariz*'s reasoning applies equally to the prosecution's introduction of peaceful character evidence, and conclude that a victim's character for peacefulness is not an essential element of a defendant's claim of self-defense and therefore can only be proven with reputation or opinion evidence. Under this holding, it was error to allow the prosecution to introduce specific act evidence to demonstrate Victim's peaceful character.

**2.     The error did not rise to the level of abuse of discretion**

{55} Prior to our holding today, there was no case law directly addressing the issue of the method by which a prosecutor may prove a victim's peaceful character in a homicide case under Rule 11-404(A)(2)(c). In the absence of controlling law, the district court was not acting contrary to law when it ruled the specific acts testimony was admissible in this case. A district court only abuses its discretion "when the evidentiary ruling is clearly contrary to logic and the facts and circumstances of the

30

case." *Armendariz*, 2006-NMSC-036, ¶ 6. It was not "clearly contrary to logic" for the district court to determine that Victim's character for peacefulness constituted an "essential element of a charge, claim, or defense" within the meaning of Rule 11-405(B), given that the State had the burden of affirmatively disproving Victim was the first aggressor.

**3.      The admission of the evidence was harmless error**

{56}      "'[N]on-constitutional error,'" such as evidentiary error, "'is harmless when there is no reasonable *probability* the error affected the verdict.'" *Serna*, 2013-NMSC-033, ¶ 22 (alteration in original) (quoting *Tollardo*, 2012-NMSC-008, ¶ 36). We analyze this question using a totality of the circumstances test. *Id.* ¶ 23. Relevant factors include "the source of the error, the emphasis placed on the error, evidence of a defendant's guilt apart from the error, the importance of the erroneously admitted evidence to the prosecution's case, and whether the erroneously admitted evidence was merely cumulative." *Id.*

{57}      Defendant argues the admission of the contested evidence was not harmless because "this was the only evidence that went directly to whether the victim in this case could have been the first aggressor." That assertion is belied by the contemporaneous audio of the incident, as well as forensic evidence, which reasonably demonstrated that Victim fired his gun in response to Defendant revving

31

his engine and driving towards Victim. Furthermore, the testimony in question was brief, lasting a little more than two minutes, and was unlikely to have affected the verdict in light of the direct physical and recorded evidence from the incident.

## III. CONCLUSION

{58} For the foregoing reasons, we affirm Defendant's conviction for first-degree willful and deliberate murder.

{59} **IT IS SO ORDERED.**

_____

**C. SHANNON BACON, Justice**

**WE CONCUR:**

_____

**DAVID K. THOMSON, Chief Justice**

_____

**MICHAEL E. VIGIL, Justice**

_____

**JULIE J. VARGAS, Justice**

_____

**BRIANA H. ZAMORA, Justice**